IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

TROY SMITH, individually and       Jacksonville, Florida
on behalf of all others
similarly situated,                Case No. 3:18-cv-1011-TJC-JRK

    Plaintiff,        April 20, 2021

 vs.                               2:02 p.m.

COSTA DEL MAR, INC., a Florida    Courtroom No. 10D
corporation,

    Defendant.
_____


FINAL FAIRNESS HEARING
BEFORE THE HONORABLE TIMOTHY J. CORRIGAN
UNITED STATES DISTRICT JUDGE


COURT REPORTER:

  Shannon M. Bishop, RDR, CRR, CRC
  221 North Hogan, #150
  Jacksonville, FL  32202
  Telephone:  (904)549-1307
  dsmabishop@yahoo.com


  (Proceedings recorded by mechanical stenography;
transcript produced by computer.)

                    A P P E A R A N C E S
COUNSEL FOR PLAINTIFF:

        **PETER P. HARGITAI, ESQ.**
        **JOSHUA H. ROBERTS, ESQ.**
        **MICHAEL MANUEL GROPPER**, **ESQ.**
        **LAURA BEARD RENSTROM, ESQ.**
        Holland & Knight, LLP
        50 North Laura Street, Suite 3900
        Jacksonville, FL  32202

DEFENSE COUNSEL:

        **SARA F. HOLLADAY, ESQ.**
        **EMILY YANDLE ROTTMANN, ESQ.**
        McGuireWoods, LLP
        50 North Laura Street, Suite 3300
        Jacksonville, FL  32202

        **JUSTIN R. OPITZ, ESQ.**
        McGuireWoods, LLP
        2000 McKinney Avenue, Suite 1400
        Dallas, TX  75201

COUNSEL FOR OBJECTOR AUSTIN VALLS:

        **BRADLEY GRAHAM BODIFORD, ESQ.**
        Terrell Hogan Yegelwai P.A.
        233 East Bay Street, Suite 804
        Jacksonville, FL  32202-3451

        **MIKELL A. WEST, ESQ.**
        Bandas Law Firm, P.C.
        802 North Carancahua Street, Suite 1400
        Corpus Christi, TX  78401

COUNSEL FOR OBJECTOR JOHN W. DAVIS:

        **ERIC ALAN ISAACSON, ESQ.**  (via telephone)
        Law Office of Eric Alan Isaacson
        6580 Avenida Mirola
        La Jolla, CA  93037-6231

COUNSEL FOR OBJECTOR MR. MITCHELL GEORGE MIORELLI:

        **SAM ANDREW MIORELLI, ESQ.**
        Law Office of Sam Miorelli, P.A
        1141 Mission Ridge Court
        Orlando, FL  32835

```
 1                      P R O C E E D I N G S
 2    April 20, 2021                              2:02 p.m.
 3                          - - -
 4            COURT SECURITY OFFICER:  All rise.  The United States
 5    District Court in and for the Middle District of Florida is now
 6    in session.  The Honorable Timothy J. Corrigan presiding.
 7            Please be seated.
 8            THE COURT:  Good afternoon.  This is Smith versus
 9    Costa.  The case is 3:18-cv-1011.  We're here today on a motion
10    for final approval of a class action settlement and a motion
11    for attorneys' fees, to which objections have been filed.  So
12    we're going to hear from the objectors today as well.
13            So on the plaintiffs' side, Mr. Hargitai,
14    Mr. Roberts, Mr. Gropper, and Ms. Renstrom.
15            For Costa, Ms. Holladay and Mr. Optiz.
16            Ms. Rottman, right?
17            MS. ROTTMAN:  (Nods head affirmatively.)
18            THE COURT:  And for the objector Valls, it's
19    Mr. West, right, and Mr. Bodiford?
20            Mr. Miorelli for -- I guess it's your brother; is
21    that right?
22            MR. MIORELLI:  Yes, Your Honor.
23            THE COURT:  Okay.
24            MR. MIORELLI:  Good afternoon.
25            THE COURT:  And Mr. Isaacson is representing the
```

1   objector Davis.

2          Mr. Isaacson, you're on the phone from California; is

3   that right, sir?

4          MR. ISAACSON:  Yes, I am, Your Honor.  Thank you.

5          THE COURT:  And is Mr. Davis on the line as well, or

6   not?

7          MR. ISAACSON:  No, he is not.

8          THE COURT:  Okay.  Maybe you can answer a question

9   for me just right off the bat, Mr. Isaacson.

10         So Mr. Davis wrote the objection.  He's a lawyer.

11  He's objected before, I understand, in other cases.  Why -- why

12  are you his lawyer, I guess is my question.

13         MR. ISAACSON:  Well, I'm his lawyer so that I can

14  make the arguments we need to make to preserve them for any

15  appellate review.

16         I've spent 20 years in the plaintiffs' class action

17  bar with Milberg, Weiss, Bershad, Hynes & Lerach and Robbins,

18  Geller, Rudman & Dowd, focused primarily on an appellate

19  practice.  And I'm very much interested in getting some of the

20  fees and incentive award issues in class action cases up to the

21  U.S. Supreme Court.

22         THE COURT:  But you -- you didn't write the

23  objection, right?  Mr. Davis did?  Is that right?

24         MR. ISAACSON:  I did not write the objection.  That

25  is correct, Your Honor.

1          THE COURT:  Okay.

2          MR. ISAACSON:  Now, Mr. Davis and I had worked

3    together on a number of matters so that, you know, we both

4    understand -- both have the same understanding on some of these

5    issues.

6          THE COURT:  All right.  Well, so I've tried to think

7    of the best way to organize the hearing.  I have read hundreds

8    of pages of stuff.

9          I have read some case law.  I've read -- I guess I

10   can't say I've read every piece of paper that was filed,

11   because I don't think that's true.  But I've read a lot of

12   material.

13         And, of course, I have familiarity with the case

14   previously as well, having preliminarily approved the

15   settlement.  So -- so I think I kind of know what the issues

16   are and what -- you know, what we're talking about here.  So

17   you can kind of keep that in mind as you're making your

18   presentations.

19         I think -- I think what I'm going to do is -- I tried

20   to think about what the right way to do this was.  I think what

21   I'm going to do is to hear from any objectors that want to be

22   heard.

23         I assume the three that actually filed the papers

24   want to be heard.  And I don't know if there's any other -- I

25   don't believe -- I'm looking in the courtroom.  I don't see any

1    other objector.

2            We had a few others who wrote letters and -- which I

3    have and have considered, but I don't -- I've not been told

4    that they wish to appear.  I don't see anybody in the

5    courtroom.  The case was duly noticed.  Nor have we had any

6    other requests to appear by phone.

7            So -- so I'm going to assume that there's no other

8    objectors that wish to be heard.  And so I think I'm going to

9    go ahead and hear from the objectors first.  And then I'll hear

10   from the plaintiff, and to the extent that Costa wishes to be

11   heard on any of the matters.

12           And I don't -- we're going to try to -- since there's

13   three objectors that have written all these papers -- obviously

14   we're not going to cover every single issue.  So I'm going to

15   offer each objector probably 10 to 15 minutes to speak, which

16   will probably include some questions from me, and -- and then

17   at the end of that I'll probably hear from the plaintiff, and

18   then -- and then from the defendant as they wish to be heard.

19           So I'm just going to go ahead and start in that way.

20   And I've got the objections here.  There's not a particular

21   order, but I'll do them in the order that I've got them here.

22           So, Mr. Isaacson, I'll hear from you on behalf of

23   Mr. Davis.

24           Mr. Isaacson?

25           MR. ISAACSON:  Yes, Your Honor.  I'm sorry.

1          I'd like to -- to start by noting there's an old saw

2    that says, "If the law is against you, argue the facts.  If the

3    facts are against you, argue the law.  And if they both are

4    against you, pound the table and attack your opponent."

5          That's what Mr. Hargitai has done in this case with

6    ad hominem attacks against me and Mr. Davis.  The opposition --

7    or response to objections at page 4 purports to quote from an

8    opinion in *Muransky versus Godiva Chocolatier*, to the effect

9    that, quote, "The plaintiff aptly characterizes Mr. Isaacson

10   and Mr. Davis as professional objectors who threaten to delay

11   resolution of class action cases unless they receive extra

12   compensation," end quote.

13         I want to point out that that was from a magistrate

14   judge's report and recommendation, and that characterization of

15   Mr. Davis and myself was rejected by the district court judge.

16   It was not accepted by the district court judge.

17         The district court judge ruled that meaningful

18   objections were, in fact, filed.  On account of our objections

19   to the timing of the fee notice and requirement of objections

20   in violation of Rule 23(h), the judge gave extra time for

21   additional objections and materials to be filed.

22         THE COURT:  Mr. Isaacson --

23         MR. ISAACSON:  He said that he would, and I quote --

24         THE COURT:  Mr. Isaacson --

25         MR. ISAACSON:  Pardon me, Your Honor?

1          THE COURT:  Yeah.  I tell you what, it's not really

2   going to help me to -- I'm interested in hearing your

3   objections on the merits.  I understand -- you know, I'm not --

4          MR. ISAACSON:  Okay.

5          THE COURT:  I don't -- you know, I understand that

6   this is an issue in class actions, whether -- you know, I -- I

7   can read.  I understand all this.

8          But I'm not really too interested in spending much

9   time on that -- or any time on it.  I'm interested in hearing

10  what your substantive objections are on behalf of Mr. Davis to

11  the settlement.  That's what I'm interested in hearing.

12         MR. ISAACSON:  Thank you, Your Honor.

13         I'll start with the facts that the supplemental

14  filings on attorneys' fees is an end run around the requirement

15  of Rule 23(h) that these materials be filed before objections

16  are due.

17         They completely changed their theory of fees from

18  what they initially applied for.  And they put in additional

19  evidence that I haven't had time, quite frankly, as a solo

20  practitioner, to go through in great detail.

21         I think it's clear that this is a coupon settlement.

22  It's a coupon settlement because the vouchers amount to coupons

23  within the ordinary English definition you find in

24  dictionaries.  Also, if you look at the legislative history

25  that they cite portions of, they ignore other portions of it.

1          Senate Report No. 109-14.  It says, at page 15, that

2     the committee has become aware of numerous class action

3     settlements approved by state courts in which most, if not all,

4     of the monetary benefits went to the class counsel, rather than

5     the class members those attorneys were supposed to be

6     representing.

7          The settlements included many so-called coupon

8     settlements in which class members received nothing more than

9     promotional coupons to purchase more products from the

10    defendant.  Well, that is exactly what is happening here.

11         The same Senate report, at pages 31 to 32, indicates

12    that coupons don't have to be worthless in order for a

13    settlement with in-kind compensation to be a coupon settlement.

14    Let me read from it.

15         It says, quote, "The committee wishes to make clear

16    that it does not intend to forbid all non-cash settlement.

17    Such settlements may be appropriate where they provide real

18    benefits to consumer class members, e.g., where coupons entitle

19    class members to receive something of actual value free of

20    charge, or where the claims being resolved appear to be of

21    actual value free of charge."

22         Now -- and that is an indication that is not a

23    question of coupons that are worthless or coupons that are

24    discounts.  The Senate Committee clearly understood that you

25    could have coupons where you're getting products from a

1    manufacturer.  And the fact that these vouchers are doing that

2    here means that it's a coupon settlement within the meaning of

3    the legislative history.

4            The Senate report says, "However, where such

5    settlements are used, the fairness of the settlement should

6    be" --

7            THE COURT:  So, Mr. Isaacson, can I ask you a

8    question?

9            MR. ISAACSON:  Yes, Your Honor.

10           THE COURT:  So let's say -- let's say I were to agree

11   with you, let's say.

12           MR. ISAACSON:  Yes.

13           THE COURT:  And I said okay.  You know, I originally

14   raised the question of whether it was a coupon settlement.  I

15   asked for briefing on it.  I got briefing.  I was persuaded by

16   the briefing that it wasn't a coupon settlement.  But now I'm

17   seeing these objections.  I've looked at it more carefully.

18   And let's say I were to agree with you.

19           All right.  So what's that mean, then?  Is that what

20   you're asking me to do?  You're asking me to find it's a coupon

21   settlement and then approve it?  Are you asking me to find it's

22   a coupon settlement and disapprove it?

23           What are you -- what is the objection?  What -- what

24   do you want?  What are you asking the Court to do?

25           MR. ISAACSON:  I am asking you, Your Honor, to find

1   that it is a coupon settlement and to disapprove it on the

2   basis that it's not an adequate recovery for the class and

3   based on the conflict of interest of the plaintiffs' class

4   action counsel in their own interest and attorneys' fees.

5         THE COURT:  So does that mean -- does that mean,

6   Mr. Isaacson, you literally want me to deny the motion for

7   class cert -- I mean, to approve the settlement and to

8   reinstate the case to my trial docket and try the case?

9         Is that -- is that what you're wanting?  Is that the

10  ultimate result that you're seeking in the case?

11        MR. ISAACSON:  I think there's one potential

12  alternative to that.  And that would be to reduce the

13  attorneys' fees award from $12 million to the attorney's

14  lodestar, or something around $2 million.  That would then

15  confer a $10 million cash benefit on the class.

16        The settlement agreement says that any reduction in

17  attorneys' fees will inure to the benefit of the class.  And

18  that would have an opportunity to have $10 million in checks

19  cut to the class.

20        I think that would make it an adequate settlement,

21  notwithstanding the very -- very many procedural problems and

22  substantive problems that it otherwise has.

23        THE COURT:  So you're saying -- you don't -- are

24  you -- are you offering that as an alternative?  In other

25  words, you're -- when you asked me to disapprove the

1  settlement, you're not -- you're saying that the settlement can

2  be modified and then -- is it -- it would be a fair and

3  reasonable settlement?

4          You're not saying that I should just disapprove it,

5  restore it to the trial docket, and go to trial.

6          MR. ISAACSON:  Well, I don't think it can be approved

7  as written if you're giving $12 million to class counsel.  If

8  you cut class counsel fees or if they forfeit it completely or

9  reduce them to something like $2 million, then you've got a

10  cash settlement where class members get $10 million in cash.  I

11  would not oppose class members getting $10 million in cash.

12          THE COURT:  And then how does this work with respect

13  to you and your -- the other objectors here?  What -- what

14  benefit -- other than your client would get a -- some type of

15  additional payment, either by way of additional voucher or by

16  way of a cash payment of that $10 million that you're talking

17  about?

18          So your client would benefit, I guess, as would all

19  the rest of the class members.  I don't know what dividing

20  $10 million into the class would give each class member.  But

21  how does this work then?  What -- what do you -- are you then

22  just pro bono counsel?  Or how does this work?

23          MR. ISAACSON:  I end up doing a lot of work pro bono,

24  Your Honor.  It would work in a way that if objectors confer a

25  very substantial benefit on the class, under the common fund

1   doctrine, the objectors can make an application for attorneys'

2   fees reasonably in connection with conferring that benefit in

3   the class.  That's part of the common fund doctrine.

4          Now, the settlement agreement says that objectors

5   cannot have lawyers paid and that it is not subject to the --

6          THE COURT:  Well, if you're -- yeah, I --

7          MR. ISAACSON:  -- common fund doctrine.

8          THE COURT:  I understand that says that, but -- so --

9   but aren't you -- if it's a coupon settlement -- if it's a

10  coupon settlement, is that inconsistent with it being a common

11  fund settlement, or not?

12         MR. ISAACSON:  Well, not necessarily.  In Texas and

13  Oklahoma, if it's a coupon settlement, the coupons are regarded

14  as a common fund and class counsel get paid coupons.

15         THE COURT:  Is that what you want to be paid?

16         MR. ISAACSON:  I don't think that's what class

17  counsel are asking for here.

18         THE COURT:  Well, is that what you'd want to be paid

19  in, is coupons?

20         MR. ISAACSON:  No, Your Honor.

21         THE COURT:  Okay.  So I guess I'm trying to figure

22  out is there anything inconsistent -- because I understand

23  it -- if it's a coupon settlement, then -- then I'm supposed

24  to -- at least one option I have under 1712(b) is to compensate

25  class counsel based on a lodestar analysis, right?

1           MR. ISAACSON:  Yes, Your Honor.

2           THE COURT:  And -- but what happens to -- so whatever

3    that is, it is.  But what happens to the rest of the money

4    then?  You're saying that money is a common fund and -- and

5    objectors' counsel are paid out of that common fund?

6           Is that what you're saying?

7           MR. ISAACSON:  Yes.  I think so.  I want to clarify.

8    I think the Ninth Circuit is correct, that this is a settlement

9    where the -- a coupon settlement where the attorneys' fees have

10   to be based on a percentage of the coupons actually redeemed.

11          And several other circuits have held that a lodestar

12   award can be given.  Those circuits have held that it may be an

13   abuse of discretion not to consider the redemption rates, and

14   indicate that the value of the settlement is important in

15   determining what an appropriate lodestar award is.

16          Those cases would be *Linneman versus Vita-Mix,*

17   970 F.3d 621, at page 628 and at page 634.  And it cites a case

18   called *Galloway v Kansas City Landsmen*, 833 F.3d 969, at page

19   975.  That's a case where class counsel thought attorneys' fees

20   were $175,000 and the Eighth Circuit held they were

21   appropriately awarded less than 10 percent of that.

22          THE COURT:  All right.  Go ahead, sir.

23          MR. ISAACSON:  Okay.  Yeah, I think that given

24   the -- a provision that says "any reduction by the Court in the

25   amount of attorneys' fees and expenses awarded to plaintiffs'

1  class counsel shall inure to the benefit of the class" --

2  because that's the only part of the -- of the settlement that

3  involves cash, that means the cash would have to be distributed

4  to the class.  And I think that any evaluation of a lodestar --

5          THE COURT:  So you're saying -- so you're saying it

6  would have to be cash?  It couldn't be additional voucher

7  value?  In other words, you can't take the $10 million --

8          MR. ISAACSON:  Yeah.

9          THE COURT:  -- and make it -- make the vouchers

10  bigger?

11          MR. ISAACSON:  Yeah.  I don't think so.

12          THE COURT:  All right.  Go ahead.

13          MR. ISAACSON:  I don't think that you can take that

14  and make the vouchers bigger.  There's no provision in the

15  settlement agreement for making the vouchers bigger.  It

16  doesn't say anything about that.

17          THE COURT:  Well, I guess the -- it says to the

18  extent that the Court awards fewer fees than are being asked

19  that it inures to the benefit of the class.  But it doesn't

20  precisely say how, does it?

21          MR. ISAACSON:  Well, because that's the only part of

22  the settlement that involves cash, I would assume that it means

23  the class members are going to get cash.  It's a very poorly

24  drafted settlement agreement in a number of ways.  But I think

25  that it's clear that any ambiguities have to be construed

1    against the drafters.  The drafters are class counsel and

2    defense counsel.  And it needs to be construed against the

3    drafters and for the benefit of class members.

4              THE COURT:  All right.  Is that all -- did you have

5    anything else you wanted to say?

6              MR. ISAACSON:  I want -- I want to add that the kill

7    switch that they put in there places attorneys' fees ahead of

8    the class's interest and that that is a breach of fiduciary

9    duty on the part of class counsel.  It deprives the case

10   of -- is a gross conflict of interest to put their interest and

11   fees ahead of the interest of the class.

12             I don't think it can be undone at this point by them

13   simply stipulating that they want to enforce it.  If a

14   settlement was an arm's length negotiation, as they say, then

15   the class counsel must have given something up to get that.

16             So you got to understand that the class got some

17   lesser recovery than it otherwise would have gotten so that

18   class counsel would get the benefit of that provision.

19             I also want to point out that Florida Bar Rule 4-1.7

20   prohibits a lawyer from representing a client if the

21   representation creates a conflict of interest.

22             The rule specifically prohibits a lawyer from

23   representing a client if there's a substantial risk that the

24   representation will be materially limited by the lawyer's own

25   personal interest.  I think that would include the interest in

1   getting attorneys' fees in this case.

2           Loyalty and independent judgment are essential

3   elements in a lawyer's relationship to a client.  Such loyalty

4   may be impaired where a lawyer cannot consider, recommend, or

5   carry out an appropriate course of action on behalf of his or

6   her clients because of the lawyer's other interests.

7           And I cite for that *Florida Bar versus Roberto*,

8   59 So.3d 1101, at page 1104, Florida Supreme Court, 2011.

9           THE COURT:  All right.  Thank you very much, sir.

10          I'm going to proceed to the next objector.

11          By the way, I -- how does this work?  Because I -- I

12  know this is something you've been involved with before.

13          So when you've got a number of objectors and they all

14  have counsel, do y'all try to coordinate your objections?  Or

15  does everybody just make their own?  Because a lot of this

16  seems very repetitive.

17          How does that work?  I'm just interested.

18          MR. ISAACSON:  Well, Your Honor, we did not know that

19  there were going to be additional objectors in this case.  So

20  there was no coordination ahead of time --

21          THE COURT:  Okay.

22          MR. ISAACSON:  -- and no real opportunity for

23  coordination.

24          THE COURT:  Okay.

25          MR. ISAACSON:  Sometimes -- sometimes objectors will

1   coordinate after objections have been filed.  It's not unheard

2   of for objectors who are separately represented in the district

3   court to join in a joint brief before the circuit court of

4   appeals, for example.

5            THE COURT:  Okay.

6            MR. ISAACSON:  But we haven't had any discussions

7   about -- about doing anything like that.

8            THE COURT:  So all of the -- the three primary

9   objectors are all just operating independently?  Is that what

10  you're saying?

11           MR. ISAACSON:  That is correct, Your Honor.

12           THE COURT:  Okay.  All right.  Well, thank you,

13  Mr. Isaacson.  You can, of course, stay on the line there.  I

14  may have additional questions for you.  But thank you for your

15  presentation.

16           So I'm now going to --

17           MR. ISAACSON:  Thank you very much, Your Honor.

18           THE COURT:  I'm now going to turn to the objection of

19  Austin Valls.

20           And, Mr. West, that's you, right?

21           MR. WEST:  Yes, Your Honor.

22           THE COURT:  All right.

23           MR. WEST:  Are we using the podium?

24           THE COURT:  Either way is fine.  Yeah.  This is one

25  of the first civil hearings I've had in the COVID era.  We've

1    been having some criminal matters.  So we're still kind of

2    feeling our way out.  But we'll -- let's go ahead and give it a

3    shot.

4              MR. WEST:  Yes, Your Honor.  It is not my intention

5    to -- as the Court noted, there are some overlaps in some of

6    the objections.  It's not my intention to rehash some of the

7    arguments.

8              I understand that the Court did originally make a

9    preliminary determination that this was not a coupon

10   settlement.  However, that was conducted at the time without

11   the benefit of an adversary proceeding or -- or objections.

12             THE COURT:  No question about it.  Now, I did -- I

13   take it you did -- because I -- I could be wrong about this.

14   But I think I sua sponte raised the issue about the coupon.

15   And then I did get supplemental briefing.

16             Did you read that supplemental briefing that I had

17   before I preliminarily approved?

18             MR. WEST:  I have.

19             THE COURT:  Okay.  So -- and then I think the

20   arguments being made by the plaintiffs now are very similar to

21   the ones they made to me before, so -- but I -- I take your

22   point.  It's a question that's not without some argument on

23   both sides.

24             In reading the cases, you could almost be left to

25   think that it's almost a case-by-case analysis.  I mean,

1   because, you know, this -- this settlement has some attributes

2   of what a coupon settlement would have, but it also has

3   attributes that would lead one to think otherwise.  So do all

4   the other cases you read.

5          You know, some of them -- some of them there's a

6   little cash involved.  Some of them there's not.  Some of them,

7   it -- some of them last for one year.  One of them lasted for

8   seven years.

9          And so I guess I -- you know, I read -- I tried to

10  read as many of these cases as I could.  But since you do this

11  for a living, how are you supposed to -- other than say it's a

12  case-by-case analysis, how are you supposed to find some

13  unifying principle that lets you know whether it's a coupon

14  settlement or not?

15         MR. WEST:  And I think it's an apt question, Your

16  Honor.  It is a very difficult case-by-case type of question.

17  And really a lot of times it comes down to the specific facts

18  of the settlement.

19         And so that's what I'd like to review, is some of the

20  facts of this settlement, in light of some of the factors that

21  class counsel have put forward as the factors for consideration

22  for whether a settlement is a coupon settlement or not.

23         One factor is whether or not a consumer has to spend

24  more money out of pocket before being able to use the -- the

25  coupons or vouchers that are being provided.

1        In this situation there are coupons of varying values

2   that are being offered to the class, 8.99, 9.99, $12, 19.99, or

3   22.99.  And class counsel provided an extensive list of

4   nominally 1300 items that could be obtained using these

5   coupons.

6        However, of those 1300 items, an $8.99 voucher will

7   get you one of 40 items, which is 3 percent of the products

8   available.  And those happen to be nine different types of

9   sticker, or it can be five different colors of the same

10  sunglasses holder, four different colors of the same glasses

11  cleaning cloth.

12       Going to $9.99, that adds a whopping 15 more options

13  out of 1300.  And six of those are the same Bowline Silicon

14  glasses retainer simply in different colors.

15       One of the cases cited by class counsel, the *Office

16  Max* case, was deemed a coupon where the $5 voucher --

17  two-thirds of the products sold by Office Max couldn't be

18  purchased with a $5 voucher.

19       Well, here the maximum value of the coupons proposed,

20  22.99, only half the products on that 1300 items, nominally,

21  list are purchasable with a $22.99 voucher.  When you go down

22  to $19.99, it's 11 percent.  $12, 4.7 percent.  $9.99,

23  4.5 percent.  And $8.99, 3 percent.

24       THE COURT:  So is it -- is it clear -- I guess it's

25  clear to you that if the settlement had been that you get a $20

1    or $40 voucher toward the purchase of sunglasses, which all

2    cost in excess of $100, I think that that would be kind of a

3    classic coupon, I guess, right?

4            Because you'd have to come out of pocket -- in order

5    to actually effectuate that, you'd have to come out of pocket a

6    substantial amount of money to do that, even though it has some

7    value, but only to somebody who wants to buy another pair of

8    sunglasses.

9            I think that's true, right, if that's what it was?

10   Right?

11           MR. WEST:  That's correct.  And the -- of the 1300

12   products on that list, that doesn't even begin to get into the

13   world of sunglasses --

14           THE COURT:  All right.

15           MR. WEST:  -- the least expensive of which was --

16           THE COURT:  So the difference here is that there were

17   other products that they sell.  And one of the things I was

18   influenced by was I -- you know, and, of course, you're right.

19   You're not getting adversarial testing.

20           But I was influenced by the idea that the -- that

21   Costa sunglasses wearers tend to also enjoy these other

22   products, that they like to buy the other stuff, and so that --

23   to the extent that -- that you have a website, to the extent

24   that the -- the settlement as it was adjusted -- I'm pretty

25   sure at my suggestion -- as it was adjusted, so that the

1    vouchers are actually just sent directly to most of the class

2    members -- some of them had to make claims.

3          So now you've got this -- this voucher.  Sometimes

4    you get multiple of them, depending on your claims, and you can

5    go on the website and you can buy something, because we already

6    know you're a customer of Costa.

7          It seemed to me that -- I mean, certainly it's not

8    probably -- I guess you could argue it's not as good as getting

9    $10 in cash, or whatever you would get.

10         But it seemed like it was something that was of

11   value.  And in the context of a settlement where liability was

12   uncertain and so forth, that it seemed, at least preliminarily,

13   to me, to be -- to be of value.

14         So tell me where I -- tell me where I'm going wrong

15   there.

16         MR. WEST:  Well, another factor in consideration is

17   not just whether it has some nominal value and that you can go

18   back to Costa to use that coupon -- that's really the issue, is

19   that in order to have any value from that coupon whatsoever,

20   you do have to return to the defendant's product line.

21         The classic comparison is with a Walmart gift card,

22   which, you know -- more appropriate today may be an Amazon gift

23   card.  Where you get a $10 Amazon or Walmart gift card, you can

24   go buy any number of products.

25         Here you are limited to the universe of Costa-branded

1    and labeled products.  And that -- I think in a very real

2    sense -- and continues to enrich the defendant with free

3    advertising by their -- their name blazoned on people who had

4    been harmed by their practices as -- that resulted in the

5    settlement.

6            And, again, similarly, there are 30 shirts that are

7    available that are counted as individual items that are all the

8    same Topwater shirt in different colors and sizes.

9            I mean, it's not reasonable to say that you've got 30

10   options for a product that you can redeem your -- with your

11   coupon when all of those 30 products are the exact same shirt

12   in different colors in small, medium, large, extra large, two

13   extra large.  It's a -- such a limited universe of product that

14   weighs in favor of a finding that it is a coupon.

15           And then the third factor that class counsel

16   acknowledges:  How much flexibility does it really have?  Does

17   it expire?  Is it transferable?  Is it redeemable for cash?

18           They are going to be coupons.  They're transferable.

19   But they're not redeemable for cash.  And they expire in just

20   two years.

21           THE COURT:  Interestingly, I read some case -- one of

22   these cases on coupons, and they were talking about whether

23   there's a secondary market for them; that is, whether you can

24   actually sell them, I guess, to somebody else who might be

25   interested who's trying to collect them and do something with

1    them.

2          I -- you know, that surprised me, that that was even

3    a thing.  But is that -- are you familiar with that paradigm in

4    these cases, or not?

5          MR. WEST:  Not in the context of these cases, Your

6    Honor.  In the broadest sense, I'm aware, as you are, that

7    there are places where you can sell gift cards.

8          Again, there's -- of course, there's been no expert

9    testimony or any concrete evidence as to what is the -- the

10   concrete value of an 8.99 Costa coupon on the secondary resale

11   market.

12         THE COURT:  Yeah.

13         MR. WEST:  There's just not any indication of what

14   that's worth.  And so it's difficult to -- to advocate to the

15   Court how to consider that.

16         THE COURT:  So let me ask you the same question I

17   asked Mr. Isaacson.  And do y'all know each other?  You

18   probably -- you must.

19         MR. WEST:  No, Your Honor, I don't.

20         THE COURT:  You don't know him?  Okay.  So -- so what

21   are you trying to get me to do?  What do you want me to do?

22         MR. WEST:  Well, Your Honor, I think that the

23   settlement -- as Mr. Isaacson pointed out, I don't think it can

24   be approved in the formation that it currently stands.  And I

25   think that the appropriate resolution is to reduce class

1    counsel's fee from a four-and-a-half multiplication of their

2    lodestar to something that is in line with reflecting the

3    redemption value -- the actual redemption value of the coupons

4    that are being provided to the class and the total actual

5    benefit that's being provided to the class.

6              And when you consider --

7              THE COURT:  And then what happens then?  Let's say I

8    do that.  So that means they're going to get less than

9    $12 million.  They're going to get something less than that.

10   And you're talking about the actual redemption value.

11   That's -- that's under 1712(a), right?

12             MR. WEST:  I believe so, Your Honor.

13             THE COURT:  Yeah.  It appears the case law is pretty

14   clear that I could also use a lodestar under 1712(b).  I just

15   read the -- I guess Mr. Isaacson cited that *Linneman* case, the

16   Sixth Circuit case.

17             And I actually just read that a few minutes ago,

18   and -- as one of the things -- one of the cases I was trying to

19   get read before we started.

20             And that court held that essentially the court has a

21   choice in which way to go with that, although you should still,

22   even in -- even in looking at a lodestar analysis, the Sixth

23   Circuit said you should still look at what -- what kind of

24   value or expected redemption that might -- might be -- might be

25   appropriate.

1    So I'm just trying to understand -- you know, it's

2   like anything else.  In some ways it's easy to say what you --

3   what you don't want.  But what do you want?  That's what I'm

4   trying to figure out.

5    MR. WEST:  Yes, Your Honor.  And I won't belabor the

6   Court with the math that's laid out in our briefing.  But

7   ultimately we believe that the Court should enter an attorneys'

8   fees award that is reflective of the redemption value of the

9   coupons.

10    And whether that is through a percentage of the

11  redemption value of the coupon or a lodestar with a multiplier

12  that adequately reflects the actual value of the settlement

13  through the redemption value of the coupons, we believe that,

14  the way the math shakes out, that should be somewhere around a

15  2 to $2.5 million attorney fee award, with the balance of the

16  attorneys' fees that were requested being returned to the

17  benefit of the class.

18    THE COURT:  So that's the same thing Mr. Isaacson

19  said, right?

20    MR. WEST:  It is a similar argument.

21    THE COURT:  And are you suggesting -- are you

22  suggesting that that -- that it go back to the class in the way

23  of cash?

24    MR. WEST:  I believe that would be the most effective

25  way to drastically improve the value of what is a minimal

1    coupon settlement at the moment.

2          THE COURT:  Let me ask you a question.  If I do

3    something like that, because I -- as I said -- and I'll say

4    this to everybody.

5          I have, over the years -- I've been doing this almost

6    18 years now as a district judge.  I've had a lot of class

7    actions.  I've had a lot of class action settlements.  I've had

8    to determine attorneys' fees before under *Camden* and the other

9    Eleventh Circuit precedence.

10         I've always been -- always been cognizant of the fact

11   that the Court, in some respects, has to look out for the

12   class.  Not that the lawyers who are representing them don't.

13   But it's -- the dynamic is such that the Court -- there's

14   nobody else here right now advocating for the class, so -- but

15   I -- and I've heard about -- you know, I've always been told

16   about objectors and people who file briefs and lawyers who do

17   this and so forth.  But this is the first case I've ever

18   actually had where it happened.

19         So -- so I'm trying to figure out how this works.  So

20   let's say I do what you say, just -- I do exactly what you say.

21   I say it's a coupon settlement.  Either on a -- on a -- on a

22   basis of -- of how many I actually redeem or on a basis of a

23   lodestar, attorneys' fees are X.  Now we've got this pot of

24   money left over.

25         Is that -- do I have that authority in the face of

1    objection?  I mean, after all, this is a settlement, right?  So

2    the two parties involved have agreed to something.

3         Do I have the authority to tell them otherwise?

4    That's question one.  Or does that send everything back to the

5    drawing board?

6         Question two is:  If I do something along the lines

7    you suggested, and now there's, let's say, $10 million in cash

8    that's going to be distributed to the class, do I have to

9    re-notice the class and tell them, "Oh, yeah, now it's changed.

10   Now you might get ten bucks plus the vouchers," or whatever

11   it's going to be?

12        I have no idea what the math is once you do the -- so

13   do I have to, like, start all over again?  Is that the way this

14   works?  I'm just trying to understand exactly what I'm being

15   asked to do and, if I do it, what happens, and how does it all

16   work.

17        MR. WEST:  Yes, Your Honor.  I think that the

18   question before you is whether or not to approve the settlement

19   as it's been presented.  And we are presenting objections to

20   that settlement saying, "Hey, as formed, it's not appropriate.

21   The Court should reject that settlement as -- as presented."

22        And the parties, with the Court's guidance, can then

23   reach an appropriate new settlement and seek to petition to

24   have that approved, at which point --

25        THE COURT:  So you're -- so you're -- even though

1   you're telling me what it ought to look like, you're not

2   telling me I have the authority to actually impose it?

3          MR. WEST:  I think that the Court can instruct the

4   parties that what -- in what it believes would be an

5   appropriate settlement.

6          THE COURT:  Okay.  And what about the notice issue?

7   Do I have to start all over again and notice everybody and

8   spend that money and so forth?

9          Is that how it works?

10          MR. WEST:  With the new settlement, with an entirely

11   new basis for fees and an entirely new relief to the class, I

12   think that a new notice would be appropriate.

13          THE COURT:  When you say you think so -- I mean,

14   since you do this all the time -- I assume you've had

15   successful objections before?  Your firm has, I know.

16          MR. WEST:  Our firm has, Your Honor.  Yes.

17          THE COURT:  Yeah.  So how does it work in those

18   cases?  What happened?  Did you actually start all over again?

19   Did you -- did you go back and notice the class?

20          Were you involved in the settlement discussions

21   that -- that then -- then do you get paid somehow out of the

22   fund?  How is all this going to work?  If I -- if I agree with

23   you, you tell me how it's going to work.

24          MR. WEST:  Well, I personally haven't been involved

25   in renewing settlement negotiations after a settlement

1    objection has been sustained or a settlement has not been

2    approved.  But it does go essentially back to the drawing

3    board.

4            There would be a new notice, because it would be a

5    new settlement, provided that there's not some resolution of

6    how to benefit the class as part of the present settlement.

7            And as Mr. Isaacson said, you know, there is a method

8    for objectors' counsel under the rules to petition for an

9    appropriate fee if they've significantly and substantially

10   improved the settlement.

11           But what we're here to do is to -- is to cross that

12   first bridge and say, "Hey, can we improve the settlement?"

13           And that's our only concern right now.

14           THE COURT:  Okay.  All right.  And I've been asking a

15   lot of questions.  If you have something you wanted to say for

16   sure, I want to give you that chance.  I didn't want to be the

17   only one asking the questions.

18           Go ahead.

19           MR. WEST:  No.  That's why we're here.  I think that

20   I've covered everything through our back-and-forth.

21           THE COURT:  Okay.

22           MR. WEST:  I don't know if the Court would allow it,

23   if after plaintiffs' counsel and defendant's counsel speak, if

24   we might be granted one or two minutes, if necessary, to

25   respond?

1          I didn't want to get into the issue of ad hominem.  I

2    understand the Court is not here to hear that.  But if it is

3    raised, I would like the opportunity to respond to that.  But I

4    didn't want to make it --

5          THE COURT:  The issue of the what?

6          MR. WEST:  The ad hominem attacks on --

7          THE COURT:  Yeah.  You know, I really -- y'all --

8    y'all wrote what you wrote.  They wrote what they wrote.  I

9    wish -- I wish none of it had to be written.  I wish Judge

10   Pallmeyer didn't have to enter the injunction she entered.

11         You know, I -- it's -- it's a little bit -- kind of

12   an ugly side of class action practice.  And I'm sorry it

13   happens.  But it hasn't -- just because y'all file objections

14   in other cases doesn't -- and just because you've had

15   difficulties in other cases, that doesn't mean that the

16   objections you're making here might not be valid.  And -- and I

17   think I'm duty bound to consider them in that light.

18         So I'm not -- I'm not going to -- I'm not -- other

19   than trying to understand how this works and how people

20   intersect and what people are really about here, I'm not -- I'm

21   willing to just consider your objections on their merits, which

22   is really all you can ask me to do, right?

23         MR. WEST:  And that's all we are asking for, Your

24   Honor.

25         THE COURT:  And that -- you've got my word on that.

1          MR. WEST:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          All right.  Mr. -- is it Miorelli?  Is that how you

4   say it?

5          MR. MIORELLI:  Yes, Your Honor.

6          THE COURT:  So can I ask you a question?  So is this

7   the first time you've practiced in the Middle District of

8   Florida, or not?

9          MR. MIORELLI:  I don't think so, Your Honor.  But the

10   last time I did, it was quite a while ago.

11          THE COURT:  I guess my question is -- you know, we

12   have a 20-page limit, sometimes 25, depending on if you're the

13   one initiating it, and yet your objection is 76 pages.

14          And I didn't even really realize it until I'm reading

15   it and reading it and I'm thinking, "Gosh, I've been reading

16   this thing a long time."

17          And I look up and, yep, I sure have.

18          And so what -- what was your understanding of how you

19   could file an objection with unlimited page numbers?  And maybe

20   the others were long -- too long, too, but I don't think any of

21   them were 76 pages.  I'm just interested in what your rationale

22   was for that.

23          MR. MIORELLI:  Yes, Your Honor.  So my perspective on

24   it is that objections to class action settlements are creatures

25   of Rule 23.  They're not motions.  They're not responses to

1    motions.  They're their own creature of the Federal Rules of

2    Civil Procedure.

3           And in many cases that I've been involved in, we have

4    not been before judges that were as liberal in allowing further

5    filings as Your Honor has been in this case.  And so it

6    constitutes the only opportunity for an objector to make any

7    sort of a record.

8           There have been cases where I've been afforded less

9    than three minutes to address the Court orally.  And as such,

10   the strategy that I take is to make sure that a full record is

11   created, at the risk of annoying an overworked judge, which I

12   understand.

13          But we find ourselves in a bit of a

14   rock-and-a-hard-place situation sometimes on these.

15          THE COURT:  All right.  Well, I'm not sure I quite

16   accept all -- that reason for filing a 76-page document without

17   permission.  But you filed it.  I read it.  So I guess we are

18   where we are, right?

19          I'm not going to -- just like I told your colleague

20   over here, I'm not -- I'm not going to hold it against you.

21   I'm just wondering.

22          Because it -- I had plenty to read here, and --

23   especially when I have three objections, which, frankly,

24   largely mirror each other.  And so -- and yours just happened

25   to be the last one I read.  And it was the longest one.  And

1   so -- anyway, all right.  Let's get to the merits.

2           You've got your time.  What can you add to this

3   discussion?

4           MR. MIORELLI:  Yes, Your Honor.  So I appreciate your

5   patience on the length of the objection.  Just to really answer

6   your first question, our position is that this is a nuisance

7   settlement.

8           If you look at the probable value of the claims, if

9   they were proved to trial that are being settled here, the

10  settlement is something like .2 percent, using the available

11  information in the record.  And our perspective is that a .2

12  percent of the claimed value settled for coupons is a nuisance.

13          And if the case really is only worth that, then

14  there's a real question about whether this case should keep

15  going at all.

16          But I think the real point here, Your Honor, is that

17  that's a question about the adequacy of the settlement,

18  because --

19          THE COURT:  So the -- should the case even keep going

20  at all?  So you represent your -- I know it's your brother.

21  But you represent a member of the class who didn't opt out and

22  is objecting, and you're telling me that you don't think

23  there's even -- are you telling me that Costa should have

24  defended the case and that it's not a case?  Is that -- when

25  you say it shouldn't have gone forward at all, is that what

1    you're saying?

2              MR. MIORELLI:  No, Your Honor.  I'm not saying the

3    case shouldn't go forward at all.  I'm saying that if the case

4    really is only worth this, then it's just a nuisance.

5              THE COURT:  So when you --

6              MR. MIORELLI:  The point is is that --

7              THE COURT:  So when you told me there's a real

8    question of whether this case should keep going at all, you

9    meant something different than what I took you to mean?

10             MR. MIORELLI:  Yes, Your Honor.  I'm sorry if it was

11   misunderstood.

12             THE COURT:  Okay.  All right.

13             MR. MIORELLI:  And it's because of this nuisance

14   settlement element here that we do think the whole thing has to

15   be rejected.

16             Now, to answer one of your other prior questions

17   about if the Court only chose to adjust the attorneys' fee, my

18   experience has been that if the settlement -- if the only thing

19   that's changed in the settlement is that the outcome for the

20   class has improved, that generally that does not require

21   re-notice.  I don't have those cites in front of me, but that's

22   been my experience.

23             THE COURT:  All right.  That's helpful.  That's

24   helpful.

25             MR. MIORELLI:  Yes, Your Honor.  And some

1    back-of-the-envelope math, a $10 million reduction in

2    attorneys' fees results in something like $18 per person going

3    to the class members as cash, as opposed to these coupons.

4         I'd just like to, without belaboring it, just kind

5    of, for the record -- you know, we agree that the blow

6    provision --

7         THE COURT:  Where are you getting the $18 from?  If

8    you got 10 million bucks and -- weren't there, like -- how many

9    people are in the class?  What are you -- I thought it was

10   2.1 million or something.

11        MR. MIORELLI:  So, Your Honor, I looked at the -- the

12   number -- the class member count that's on page 3 of Amanda

13   Sternberg's declaration.  If I have -- if I've done math at the

14   table wrong, I'm sorry.

15        THE COURT:  I'm not sure.  I'm just -- you said back

16   of the envelope -- back of the envelope $10 million,

17   2.1 million people.  I don't think that gets 18 bucks, does it?

18        MR. MIORELLI:  You're right, Your Honor.  Sorry.  I

19   only added up one -- one column.  So it's about five bucks a

20   person.  Still -- still, it's cash.

21        THE COURT:  All right.

22        MR. MIORELLI:  So just to make clear on the record,

23   we agree that the blow provision is improper.  And, Your Honor,

24   our perspective on that is that it's not adequate that the

25   parties have withdrawn from it, because something was given

1    away from that objector.  Counsel Isaacson pointed that out.

2          And this -- this also gets to -- we also agree about

3    the -- the multiplier on any lodestar fee would be

4    inappropriate.  And we agree with section 2C of the Davis

5    objection on that.

6          We also agree that the Boedeker declaration is

7    improper.  And so we filed an objection to the evidence related

8    to the former judge.

9          And, Your Honor, I think it's important -- whether

10   the Court decides that *Daubert* and the rules of evidence apply

11   or not, it's important that the class knows the standard upon

12   which the Court has weighed the evidence.

13          And our perspective is that there's really no record

14   evidence in front of the Court right now for the Court to make

15   an intelligible determination as to what the bargain is for the

16   class.  Is it as we see it, .2 percent, or is it something

17   else?

18          There's some vague references to risk of litigation,

19   risk of not succeeding at trial.  But no one negotiates like

20   that.  Those people -- you have to have some concrete idea of

21   what's being gained and what's being lost.

22          THE COURT:  Did you -- you know who Terry White is,

23   right?

24          MR. MIORELLI:  No, Your Honor.

25          THE COURT:  Okay.  Terry White was the mediator in

1  the case, very highly respected, probably the dean of mediators

2  in probably the state of Florida.

3          And he gave an affidavit that -- he said -- you know,

4  obviously, he couldn't tell what -- I'm sure you saw his

5  affidavit.

6          MR. MIORELLI:  Yes, Your Honor.

7          THE COURT:  He gave an affidavit that said this was

8  hard-thought and there were lots of -- lots of issues and --

9  and the parties acted professionally and reached a -- a

10  settlement.

11         So at least in his eyes, I don't think, if you asked

12  him, he would characterize this as a nuisance settlement.  I

13  don't know what -- I mean, it's a little -- I mean, I don't --

14  all I'm telling you is that Terry White is -- as a mediator is

15  about as good as it gets.

16         And so does that play into this at all?  Or what --

17  you know, I mean, are you saying that -- are you saying that

18  Costa had a better case?  Are you saying that the plaintiffs

19  had a better case that they didn't carry forward enough?  In

20  other words, this settlement should have been much better for

21  the plaintiffs because they had a much stronger case?  Are you

22  making that evaluation?

23         How are you coming to the conclusion that the

24  agreement that was reached is not a good deal for the class?

25         MR. MIORELLI:  So, Your Honor, our position is that

1    the Court has to make that evaluation of whether or not the

2    trade-off of continued litigation and the result of the

3    settlement is adequate.

4         And part of the reason for the several -- not only

5    our objection to the evidence, but, as I read it, the other

6    objectors' objections to various declarations, is it seems that

7    class counsel is trying to outsource that judicial review to

8    these experts.

9         And even reading the mediator's declaration, even

10   there there is still no concrete evaluation of what were the

11   best- and worst-case outcomes for the various parties.

12        And so there's really no evidence before the Court on

13   which the Court can make a -- an intelligible determination of

14   the relative merits and costs of the settlement compared to

15   ongoing litigation.

16        And that -- that's something that not just the

17   objectors are asking for, but the -- the class is entitled to

18   from the Court, because that's how the class knows that the

19   Court has properly executed its fiduciary obligations to the

20   class.

21        So I think maybe the answer is the Court needs more

22   briefing on that point.  But nevertheless, I think, as is,

23   there's no evidence for the Court to make an intelligible

24   determination that this size of a coupon, this number of

25   coupons is adequate.

1      THE COURT:  Well, I mean -- I mean, I have some

2   evidence of what happened.  I mean, I know in one of the cases

3   they had to go up on appeal.  I know -- I mean, because there

4   were three cases, as you know.

5      MR. MIORELLI:  Yes, Your Honor.

6      THE COURT:  They all got given to me, for reasons

7   passing understanding.  But here I am.  So -- and -- so, I

8   mean, there was a lot going on.  They had to appeal the one.

9   They had a judge out in Texas that didn't like their case.

10      And so, you know -- I mean, when you say I need more

11   information, do I need -- what kind of evaluation -- am I

12   supposed to say I think that I -- I need briefing on the

13   merits, so I need to decide whether Costa was going to win a

14   motion for summary judgment or not, or I need to decide whether

15   this affirmative defense was going to -- I mean, are you

16   talking about that?

17      MR. MIORELLI:  No, Your Honor.

18      THE COURT:  Is that what I'm doing?

19      MR. MIORELLI:  I'm talking about the actual value,

20   right?  So there's an operative complaint in the Court's record

21   right now.  Apparently from the documents, Costa has a pretty

22   good idea of how many customers were affected at various levels

23   and at various degrees.  Presumably that means they also know

24   how much money is at stake here.

25      And as far as I can tell -- maybe class counsel knows

1    and I haven't seen it in the record.  But it doesn't appear

2    that the class members, the objectors, or Your Honor, have that

3    information.

4           And without that information, we're all left to

5    guess.  And respectfully, Your Honor, I don't see how guessing

6    is an intelligible principle on which to decide whether or not

7    to approve the settlement.

8           To go to one other thing, which is the cy-pres -- so

9    even if the Court decides to approve the settlement, the

10   cy-pres is truly outrageous, Your Honor.

11          You know, we raised this issue pretty aggressively in

12   our briefing.  It's a bit of a hobby horse of mine in some of

13   this litigation.

14          And in response there was a new declaration from

15   Costa's director of marketing.  But it still doesn't tell the

16   class who's going to get the money or how much money or why or

17   anything else.

18          So it's still -- the class is left just to guess

19   about whether or not this million, now one million three

20   hundred -- or thirty thousand dollars is something that even

21   remotely could benefit them.

22          THE COURT:  Remind me, in what circumstance does a

23   cy-pres award kick in?

24          MR. MIORELLI:  Your Honor, the cy-pres award is given

25   if there's unredeemed coupons, which seems highly likely in

1    this case.  As we filed a declaration that has been in Orlando,

2    coupon redemption rates are something like 3 percent, except

3    it's capped at a million dollars.  So I think Costa was capping

4    their risk here of having to pay a $30 million cy-pres payment.

5           But the point is -- is cy-pres is French for as close

6    as possible.  And the Court is supposed to make sure the

7    cy-pres payments are only made when it's the next best thing to

8    giving the money to the class.

9           Our position is a million bucks is probably enough to

10   give to the class, at the very least through an increased

11   voucher or coupon, if the Court decided to do that, but -- but

12   even beyond that, the class has to -- even if there is going to

13   be a charitable donation, the class has to have an opportunity

14   to find out whether that charitable donation is something that

15   has any rational relationship to warranty act claims, fishing

16   sunglasses, anything of the sort.

17          And all we have is a statement from Costa's director

18   of marketing that it could include by way of an example a

19   couple of charities.  There's no certainty whatsoever.

20          THE COURT:  Show me the -- because I -- I didn't even

21   look at it.  I'm looking at the amended settlement agreement.

22   What -- where is the cy-pres award in the agreement?  Do you

23   know?  Somebody else might have --

24          MR. OPTIZ:  Page 18, Your Honor.

25          THE COURT:  Page 18 of the amended agreement?

44

1          MR. OPTIZ:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. MIORELLI:  And, Your Honor, the Costa declaration

4    I'm referring to, it's in the record at docket 134-8.

5          THE COURT:  So is cy-pres recipients under this

6    defined or not?

7          MR. MIORELLI:  It's not, Your Honor.  And that was

8    one of our objections.  In response they filed the additional

9    declaration, which still doesn't define it.

10         THE COURT:  Okay.  I got it.  All right.

11         MR. MIORELLI:  Your Honor, just very quickly, our

12   view is that the injunctive relief is worthless to the post

13   purchaser class.  I think that that's been covered in the

14   papers pretty aggressively.

15         And, finally, I would just like to -- to point out,

16   on the filings that were made recently of class counsel's fees

17   and their claimed expenses and all, that part of their claimed

18   expenses is about $62,000 for Judge Scott and Mr. Barry

19   Richard's declarations.

20         And it seems like they intend to have the

21   settlement -- pay them for that out of this $12 million, or out

22   of some lodestar-plus-costs idea.

23         And, Your Honor, respectfully, I don't think the

24   class should be paying for experts who only come before the

25   Court to tell the Court that it should award an outrageous

1  attorneys' fee to class counsel.  I don't -- I don't see how

2  that benefits the class.

3          The other thing I'd point out in that is that --

4          THE COURT:  So when you use the word outrageous,

5  what -- and I understand, at least from reading, that this

6  is -- obviously this is something you -- you do, right, part of

7  your fee?

8          MR. MIORELLI:  And a fee, Your Honor.

9          THE COURT:  Part of your practice is objecting to

10 class settlements, right?

11         MR. MIORELLI:  I'm no longer current- -- my day job

12 is not the practice of law.  I'm a businessperson.

13         THE COURT:  Okay.  So you're just helping your

14 brother out here?

15         MR. MIORELLI:  I represent friends and family when I

16 see class actions that I think are unreasonable.  I think

17 outrageous attorneys' fees are -- give a bad look to the bar.

18         THE COURT:  Okay.  So can you -- based on your

19 experience or some other metric you can give me -- you know,

20 the basis for the $12 million was, and is, that this settlement

21 had a $40 million value plus the value of injunctive relief,

22 and that -- so, therefore, on a *Camden*-type analysis, it was

23 within the -- within the range.

24         And I -- by the way, I had never -- although I

25 preliminarily approved the settlement, I had never been asked

1  to, nor had I expressed any opinion on -- on the fee, and that
2  was going to -- that's part of what I'm doing here.
3      So -- so we can all agree $12 million is a lot of
4  money.  No -- I don't think -- we can all agree on that.  But
5  when you call it outrageous and -- that leads me to believe
6  that you have some metric or some experience that would -- with
7  another case or with some other situation that would allow you
8  to compare them so that this is outrageous.
9      So can you -- can you give me an idea of what -- what
10  makes it outrageous?
11      MR. MIORELLI:  Yes, Your Honor.  So, first off, it's
12  outrageous compared to what the class gets.  In a proper common
13  fund case, the attorneys are getting something like 25 to
14  33 percent of what the class is actually getting.  And class
15  counsel doesn't propose to do that.
16      If he did, I don't think we'd be here objecting,
17  because you could go look at what the redemption rate is, or
18  maybe have some expert testimony about the redemption rate, and
19  then scale the fee appropriately.
20      But as it stands, it seems highly likely that the
21  total amount of even redeemed coupons by the class will be less
22  than the $12 million in cash class counsel seeks to get.
23      And then the second way you can evaluate it is based
24  on the lodestar multiplier.  And with all due respect to the
25  other colleagues in the room, a four-plus multiplier is

1    enormous.  It would result in some lawyers in this room

2    getting, I think, something like $3,000 an hour or close.  I

3    mean, that is an enormous amount of money.

4         And if you look at, for example, in the Northern

5    District of California, where a lot of these class actions are

6    filed, getting a lodestar multiplier more than about 1.2 or 1.3

7    in the last few years is pretty uncommon, in part because the

8    Ninth Circuit polices it so aggressively.

9         And, Your Honor, I think that that might just bring

10   me to the last point, which is *Perdue*.  You know, our position

11   is that *Perdue* applies here.

12        Our view is that class counsel's opposition to that

13   is based on a panel opinion that was overturned by the -- the

14   Eleventh Circuit en banc, which really destroyed the entire

15   question of attorneys' fees, because it was about standing

16   altogether.

17        We believe the Court should award based on a common

18   fund based on the actual redemption rate of the coupons.  And

19   though properly followed, we think that unfortunately that

20   would probably result in a below lodestar fee, which is partly

21   why we're objecting to the whole thing, instead of just the

22   attorneys' fees.

23        And just for preserving the issues for appeal, I want

24   to be really clear that our position is that *Perdue* applies to

25   this case no matter any other Eleventh Circuit precedent.

1        And to the extent that this Court believes an

2   Eleventh Circuit precedent would mean it's not obligated to

3   follow *Perdue*, our position is that that precedent is wrong in

4   light of *Perdue*.

5        THE COURT:  And what -- and tell me -- *Perdue* -- if I

6   follow *Perdue*, because they -- as you know, y'all briefed this

7   hard.  They briefed it hard.  You just completely disagree on

8   whether *Perdue* applies in this situation or not.  And I guess

9   I've got to figure that out, or -- maybe I do.  I don't know,

10  but...

11       So -- but let's say it does apply.  So what -- if I

12  said, "Okay.  *Perdue* applies," what is that going to do to my

13  analysis?

14       MR. MIORELLI:  Your Honor, I think what that does

15  with your analysis is it results that a lot of the *Johnson*

16  factors cannot be pointing towards a multiplier, because they

17  would point to a multiplier in every single class action

18  settlement if it did.  And *Perdue* instructs that any sort of a

19  judicial factor that does that is unlawful, and -- at the risk

20  of asking you to read anything more.

21       But I would just point out Judge Lee's opinion in a

22  case I litigated in the Ninth Circuit in chambers, I think,

23  does have a very good job of pointing out how even in a circuit

24  where you have these multi-factor tests, you can still apply

25  those multi-factor tests, as long as you don't forget about

1    *Perdue* when evaluating factor by factor, if that factor really

2    does support a multiplier.

3            And Judge Lee's finding was that the vast majority of

4    factors in most class actions can't support a multiplier,

5    because they would support a multiplier in every case, and that

6    violates the Supreme Court's commands.

7            THE COURT:  So before you sit down, tell me precisely

8    what it is -- I'm here today.  I'm having a hearing.  You know

9    the motions that are in front of me.  What's your -- what are

10   you precisely asking me to do?

11           MR. MIORELLI:  Your Honor, we would like you to deny

12   final approval.  And, of course, that means denying the motion

13   for attorneys' fees as well.

14           We would like you to have some sort of an inquiry

15   about how such a settlement like this, with six different

16   self-dealing provisions in favor of class counsel, was ever

17   presented to you in the first place, and then give the

18   opportunity for the parties to either try to settle it again or

19   move the case forward.

20           THE COURT:  Thank you.

21           MR. MIORELLI:  Thank you, Your Honor.

22           THE COURT:  Okay.  I think it's -- we've been going

23   about an hour.  I think before I hear from the other side here

24   I'm going to -- let's just take a brief recess.  Let's try to

25   keep it to five minutes.  And you can take a comfort break and

 1    I'll be back out.

 2              Thanks.

 3              COURT SECURITY OFFICER:  All rise.

 4         (Recess from 3:10 p.m. to 3:19 p.m.; all parties present.)

 5              COURT SECURITY OFFICER:  All rise.  This Honorable

 6    Court is back in session.

 7              Please be seated.

 8              THE COURT:  Mr. Hargitai, are you the one that's

 9    going to do the talking?

10              MR. HARGITAI:  Yes, Your Honor.  I have that role

11    today.

12              THE COURT:  All right.

13              MR. HARGITAI:  Your Honor, if I may ask, just because

14    I have to wear reading glasses which fog up, is it okay if at

15    the podium I take my mask off?

16              THE COURT:  Yes, sir.

17              MR. HARGITAI:  Thank you.  I have received the shot.

18              And, Your Honor, may I approach?  Because I have a

19    demonstrative aid that I think could help -- aid the Court.

20              THE COURT:  Okay.

21              MR. HARGITAI:  I think, Your Honor, I'll start by

22    saying the one and only irrelevant thing I plan on saying

23    today, and that is that my team and I are very proud of the

24    results that we've achieved in this case.

25              I could probably talk for three to four hours with

1    Your Honor about what we've done.  I will try to not do that.

2    And I assume that Your Honor will ask me plenty of questions

3    about what Your Honor wants to hear.

4            I've put together this Costa stats page because,

5    first and foremost, I wanted to talk about the value of the

6    relief that we're bringing to this class.  It certainly isn't

7    outrageous or anything like that.

8            We quantify the number of -- at $73.6 million.  And

9    here's how we get there.  There's $40 million in vouchers,

10   costs, and fees.  And the Eleventh Circuit has told us that

11   those are all part of the benefit to the class in the Eleventh

12   Circuit.  There's $17 million in free shipping which we

13   negotiated separately with Costa after we made this deal.

14           With 1- -- with 1.7 million vouchers going out the

15   door as of the settlement as it stands now, times 9.95 in

16   shipping, that's an additional $17 million for the class.

17           And that's important when you talk about the

18   flexibility and the out-of-pocket issue on whether or not this

19   is a coupon under CAFA.

20           And none of the class members have to pay any sales

21   tax to obtain product.  At an average of 6 percent sales tax

22   across the country, that's approximately $1.6 million of

23   benefit.

24           Now, Your Honor, *Parsons* tells us something very

25   important in the Eleventh Circuit.  And this is on page 12 of

1    the opinion.

2           They say, "The Eleventh Circuit has made clear that

3    the value of economic relief to the class is calculated based

4    upon the amount made available to the class" -- the word

5    "available" is in italics -- "not the total amount actually

6    claimed by class members."

7           And that's an important distinguished factor --

8    distinguishing factor because the objectors come before Your

9    Honor today and they claim that, "No, it's about what these

10   folks claim at the end of the day or how these benefits are

11   used."

12          That is irrelevant in the Eleventh Circuit.  *Parsons*

13   goes on to cite *Waters*, another Eleventh Circuit case, that

14   says the percentage of the benefit applies to the total

15   benefits provided, even where the actual payments the class

16   following the claims process is lower.

17          Moreover, the *Waters* court stated that, quote, "No

18   case has held that a district court must consider only the

19   actual payout in determining attorneys' fees."

20          And so, Your Honor, that brings us to the injunctive

21   relief, which we concede is more difficult to quantify than the

22   other relief.  And that injunctive relief under another

23   Eleventh Circuit case, *Gillette*, explains to us that the

24   non-monetary relief is also part of the settlement pie.

25          And because of our good work, Costa has agreed to

1    present its warranty now as only a limited lifetime warranty.

2    They stopped describing the repair fees as nominal.  They

3    stopped selling glasses in their nominal fee packaging.

4         They threw away all of their inventory.  They created

5    new non-deceptive packaging.  They modified their website to

6    disclose repair prices that consumers are going to have to pay.

7         And a new very important issue, Your Honor, they've

8    no longer -- they've agreed to no longer charge a processing

9    fee for warranty repairs.

10        And so we submit to the Court that there's two ways

11   to value injunctive relief.  The first is, you take the

12   $5 million that Ms. Morrisey testified in her declaration that

13   it would cost Costa to make all of these changes and you add to

14   that the $9.97 million of actual quantifiable benefits that

15   folks that own lifetime warranty glasses would receive into the

16   future.

17        And this is precisely the way the *Parsons* court did

18   it when looking at the injunctive relief they received in that

19   case.

20        In that case the cable provider said, "We're going to

21   agree not to charge rental fees on the boxes going forward."

22        And the Court looked at the number of class members,

23   the rental fee per month, made an easy calculation and said,

24   "Here's the value of injunctive relief."

25        I believe in that case it was around $72 million.

1      Here it's also very simple.  We have the actual

2  historical warranty rate for these very class members.  It's

3  834,657.  You multiply that by the 11.95 that they will never

4  have to pay anymore and that's $9.97 million.

5      THE COURT:  So I'm looking at *Parsons* and I wanted to

6  ask you -- the requested fee award here is only approximately

7  3.4 percent of the funds available to the settlement class.

8  The requested fee is well below the range the Eleventh Circuit

9  has authorized to come out of the common fund.

10      And so -- and I recognize you're citing *Parsons* for

11  different propositions.  But the -- that's not what we're doing

12  here, right?  That's not what you're requesting in this case.

13      I guess if you -- is 73.6 million -- that seems

14  higher than even what I remember reading from when I

15  preliminarily approved it.  Is that -- has that number gone up

16  in some --

17      MR. HARGITAI:  It has only because of what I just

18  discussed, Your Honor, and that is, as of approximately three

19  weeks ago or so, Costa agreed to no longer charge 11.95 to

20  lifetime warranties.

21      We can say that that is a result of this case

22  because, absent taking that fee away, there would likely be

23  another class action by some other attorney four years down the

24  road for all these continued fees that they would charge to

25  lifetime warranty consumers, because there are hundreds of

1    thousands of consumers out there that still own their glasses.

2    And when they bought them, they bought a lifetime warranty.

3              THE COURT:  All right.  Go ahead.

4              MR. HARGITAI:  The other way to value injunctive

5    relief -- and Your Honor has seen the Stefan Boedeker

6    declaration.  He did a conjoint analysis and a survey of folks

7    that -- purchasing the sunglasses.  And he came up with an

8    amount of money that Costa could no longer charge for its

9    glasses.  That estimate is high.  We concede that.  We've taken

10   the low range of that.

11             But interesting, that's sort of -- that has bore out

12   in the marketplace, because Costa's prices, despite the fact

13   that outdoor products are flying off the shelf, have come down.

14             And I checked today, Your Honor.  You can buy a

15   brand-new pair of sunglasses online for $89.  There's discounts

16   across the board and things like that available to consumers.

17             The total value of the estimated vouchers that are

18   going to be given out as of today is $27,212,438.

19             And interestingly, this proves the fact that this is

20   a common fund case, Your Honor.  And this will address some of

21   the issues by the objectors.

22             Because of the claims rate, we were able to increase

23   the value of the vouchers.  So no matter what, Costa is paying

24   approximately $28 million out the door in vouchers.  If there

25   were fewer claims rate, it would still be $28 million.  If

1     there were more, still $28 million.  Because the residual goes

2     to the value of the vouchers.

3              Same thing for attorneys' fees.  If Your Honor cuts

4     our fee, the benefit goes towards the class.  I will tell you

5     that between myself and Costa's counsel, we did not envision

6     that that would go in cash.

7              We believed that that would increase the value of the

8     vouchers.  And there's nothing in the settlement agreement that

9     says that we anticipated that to be distributed as

10    class [sic] to the class members.  But what it would do, as all

11    common funds operate, is go to the benefit of the class

12    members.

13             And now --

14             THE COURT:  Are you saying that it would -- if the

15    fee is $10 million instead of $12 million, the -- as an

16    example, that the $2 million would be plowed back into the

17    vouchers and the -- the amount of the vouchers would go up?

18    That's the contemplation?

19             MR. HARGITAI:  That's exactly correct.  And at

20    $1.7 million vouchers, each voucher would increase by a little

21    over a dollar under those circumstances.  I think the numbers

22    that Mr. Miorelli cited to are very much incorrect.  There are

23    1.7 million vouchers going out the door.

24             If Your Honor were to cut our fee by $10 million, the

25    vouchers would only go up by $1.70 per voucher.  Not $5, not

1   $18, but $1.70.

2          In terms of the value of the vouchers per class, as I

3   just indicated, those have gone up.  Mr. West's numbers were

4   incorrect.  They were based on the original filing.

5          The warranty class members will receive 8.99.  That

6   stays the same.  And the reason that one wasn't adjusted

7   upward, Your Honor, is because that's -- they're already

8   getting more than a 100 percent recovery.

9          So when objector's counsel says this is a terrible

10  result, that's just flat-out wrong.  The maximum recovery in

11  that case, Your Honor, would be 11.95.  The processing fee that

12  they were being charged, they're going to get a voucher for

13  8.99, plus free shipping and handling, plus free tax, which

14  gets them above 100 percent recovery, which is to include --

15  you know, it's excellent.

16         The Florida repair class and the nationwide repair

17  class, they'll get 22.99 each and the Florida purchase class

18  will get 12.99.

19         But what is very interesting, and Your Honor noted

20  this, is that these folks love Costa.  And so of these various

21  class members, a very significant percent are going to receive

22  more than one voucher.

23         So, for instance, the warranty class is -- 28 percent

24  will get more than one.  The repair -- Florida repair,

25  35 percent.  The nationwide repair, 30 percent.  And the

1   Florida purchase class, 88 percent are going to get more than

2   one voucher.  79 percent are going to get more than three

3   vouchers.

4           And by way of example, if you just look at these

5   objectors' claims, Mr. Davis, he paid 12.99 for his warranty.

6   Your Honor, he's getting $20.99 back.  That's a good result for

7   Mr. Davis.

8           Mr. Miorelli, he is going to get $127.96.  He will be

9   able to choose from over 1309 items, including brand-new

10  sunglasses, even though there's nothing wrong with them.

11          Valls -- Mr. Valls will receive $100.99, also over

12  1309 items.  He can also buy new sunglasses.

13          The percentage of class members objecting is .0003

14  percent.  And the percentage of opt-out is .0004 percent.

15  Those are fantastic numbers.

16          Our notice data is also exemplary.  As Your Honor

17  knows -- and thank you, Your Honor.  You -- you helped us make

18  at least more than half of this class claims paid.  We've done

19  that, and -- because we knew all of those folks' e-mail

20  addresses.

21          And so we attempt to deliver to them -- 939,400

22  actual deliveries.  We confirmed delivery of 939,479.  That's

23  an actual delivery rate of 99.5 percent.  I've never seen one

24  as high since I've been looking and doing class actions.

25          With respect to the notice for the purchase class

members, our campaign on Google, Yahoo, Instagram, Facebook,
and two actual fishing publications generated over 103 million
hits.

And then in terms of the hours that we worked on
this, we spent over 6,000 hours.  By comparison, McGuireWoods
spent over 15,000 hours, with no risk and no contingency.

Judge Scott and Mr. Richard believe this is an
excellent result.  And we agree with that.  And we believe
their declarations are helpful.

So now let's -- with that aside, let's get into some
of the meat of these arguments.  And I'll start from the last
argument raised by Mr. Miorelli.

He improperly alleges that *Perdue* applies and that no
multiple is available under the lodestar analysis were this a
coupon under 1712(b).

He knows very well, and these other objectors know
very well, that this argument, which has been rehashed time and
time again, has been rejected time and time again by the
Eleventh Circuit.

In *Muransky*, a case that Mr. Miorelli was involved
in -- that Court held *Perdue* addresses fee-shifting statutes
and says nothing about the award of attorneys' fees from a
common fund.  That should have been the end of the story, but
there's more.

*Home Depot*, another case that Mr. Miorelli was

1   involved in, the Eleventh Circuit again said, quote, "*Perdue*,

2   which forbids multipliers in fee-shifting cases, has no

3   application to common fund cases."

4          That should have been the end of the story.  But most

5   recently *Johnson*, in which Mr. Isaacson and Mr. Davis were --

6   participated, that court said, just last year, "As we recently

7   explained, *Perdue* didn't abrogate *Camden I*."

8          So that's not even a good faith argument when you've

9   got three times over the Eleventh Circuit says the argument

10  doesn't work.

11         THE COURT:  So does -- I read this *Linneman* case from

12  the Sixth Circuit.  Are you familiar with it?  And if you are,

13  is it -- do you view it as contrary to the Eleventh Circuit?

14  Or is there a nuance I'm missing here?  Because they -- they

15  seem to think that *Perdue* does apply in that case.

16         MR. HARGITAI:  Well, in the cases cited by objectors,

17  they're not common fund cases.  And so that *Whirlpool*,

18  *Vita-Mix*, *Multi-Cinema, Student Loan Express*, that's a bit of

19  misdirection, because these aren't common fund cases.

20         We will submit to you, Your Honor, *Perdue* does apply

21  in common fund cases.  And the Eleventh Circuit has held so in

22  *Home Depot*.

23         That case, the settlement was structured differently.

24  In *Home Depot* they agreed that the defendant would pay the

25  attorneys' fees separately.

1          "Here's the settlement, Court.  We're going to pay

2   separately.  Now, Court, you've got to approve this payment.

3   Any benefit in the reduction of fees would go to the

4   defendant."

5          That's not what we have here, Your Honor.  What we

6   have here is any reduction in fees goes to the benefit of the

7   class.

8          And the Eleventh Circuit has addressed very clearly

9   sort of the factor that goes into determining whether this is a

10  common fund or not.

11         In *Home Depot*, which was not a common fund case --

12  and, of course, cited by objectors in support of *Perdue*, which

13  is a -- it doesn't work.

14         *Home Depot* says, "A common fund is where the lawyer

15  recovers a fund for the benefit of others and takes his fee

16  from the fund."

17         The key, according to *Home Depot* -- and I quote, "The

18  key is whether attorneys' fees reduce the class recovery."

19         And here they do.

20         *Gillette*, in the Eleventh Circuit, has said, "A

21  common fund need not be funded and can be a claims made fund."

22         And *Waters*, another Eleventh Circuit case, has said,

23  "The possible reversionary nature of the fund doesn't make it

24  any less of a common fund."

25         In both *Muransky*, in which -- the objectors were

1    involved in, and *Diaz versus Hillsborough County* here in the

2    Middle District -- say that you can start with a fee-shifting

3    claim.  But if that settles in a common fund, it becomes a

4    common fund and *Perdue* doesn't apply.

5         These are very straightforward, black letter

6    principles in the Eleventh that the objectors are asking this

7    Court to ignore.

8         The other thing that they're asking this Court to

9    ignore in the *Perdue* analysis is they say, "Well, you know,

10   there has been no case in the Eleventh that addresses a

11   multiplier in a coupon case."

12        And I'll -- we'll talk about coupon cases in a

13   minute.  But there's a very simple reason for that, Your Honor,

14   and there's a reason why there isn't a case on point, frankly,

15   in any jurisdiction.  And that is because CAFA, under its plain

16   language, says, "Nothing in this subsection shall be construed

17   to prohibit application of a lodestar with a multiplier method

18   for determining attorneys' fees."

19        It would be odd, indeed, for someone to litigate that

20   very issue when it's -- it's that plain in the statute.

21        Now, let's talk about whether or not this case is a

22   coupon.  It is not.  The objectors want this Court to use their

23   dictionary definition.  They ignore a more salient definition

24   within the same dictionary.

25        But we're not here to argue that the Court should

1    adopt either party's dictionary definition.  I think the point

2    of the exercise is that every court to look at CAFA has said

3    this is ambiguous in the coupon provision and, therefore,

4    resort to legislative history is appropriate.

5            And so when you do that, you see that the legislature

6    was concerned with settlements that involve a discount,

7    frequently small one, on products.

8            THE COURT:  So if this was -- if this was -- if Costa

9    didn't have a website that sold T-shirts and whatever else they

10   sell, and all they sold was sunglasses, and the deal was that

11   you're going to get a $20 voucher as part of the settlement,

12   would that be a coupon case?

13           MR. HARGITAI:  Yes.  Absolutely.  And that is --

14           THE COURT:  So the key distinction is that the

15   plaintiffs' -- the class members can purchase merchandise

16   without coming out of pocket to do so?

17           MR. HARGITAI:  I would answer that by saying it is

18   one of the key distinctions, yes.

19           THE COURT:  And how do we know -- how do we know they

20   want to do that?  I mean, they're -- you're -- the way -- the

21   way -- the way they got into the class was not because they

22   bought a T-shirt, it was because they bought sunglasses that

23   had a warranty issue on them.

24           How do we -- how do we know that's bringing value to

25   them that -- without requiring them to spend another $80 to buy

1      a pair of sunglasses?

2              MR. HARGITAI:  Well, interesting, Your Honor, when

3      you look at the percentage of members that opted out, say, "We

4      didn't want part of this deal," the universal reason for opting

5      out was because, "We like Costa.  We like the products.  We

6      don't think Costa should have to give us any money."

7              That's one indicator.

8              Another indicator is the affidavit or declaration of

9      Costa that -- and Costa's expert in the underlying litigation

10     that they have this tribe affiliation, that people make repeat

11     purchases from Costa product.  And, in fact, they do.

12             When you look at how we have to distribute these

13     vouchers, again, 88 percent of people that bought sunglasses

14     bought more than one pair, and a large percentage of every

15     other class are going to get multiple vouchers because they

16     continue to shop at Costa.

17             Costa is a very strong brand.  It has very strong

18     affiliation.  There's evidence in the record for that, which

19     makes us believe that these vouchers are going to get used.

20             Again, that -- and that -- that is simply one factor.

21     But the bottom line is they can use them without coming out of

22     pocket.  And that distinguishes a lot of cases cited by

23     objectors where people had to pay sales tax, where people had

24     to pay shipping.

25             I'll give the Court an example.  *EasySaver* is a case

1    that the objectors rely upon, saying that, "This torpedos our
2    case."

3           No, it doesn't.  It supports our case in every bit.

4           In *EasySaver* it was about a company that stole the
5    class plaintiffs' data when they shopped there.  But you buy
6    flowers and you buy chocolate from EasySaver.  It's like a
7    Valentine's Day online store.

8           They settled the case for vouchers worth X amount of
9    dollars, but you couldn't use -- so factor number one in the
10   *DVD* analysis, "Do you have to come out of pocket," the Court
11   found that, no, you couldn't buy one of these 15 products
12   without coming out of pocket, because you'd have to pay for
13   shipping.  So it failed that first factor.

14          In terms of the range of items that would be free,
15   again zero, because you'd have to come out of pocket.  And then
16   with respect to the flexibility of the voucher in that case, it
17   was amazing.  You -- you couldn't use it on Valentine's Day,
18   Mother's Day or any other holiday.  You -- they weren't freely
19   stackable or transferable.

20          And it -- and so it was like, "When are you going to
21   use these things?  You can never use them.  Who's going to buy
22   flowers on a Tuesday when you have to come out of pocket?"

23          It was a bad result and didn't meet the factors.

24          If we go through the *DVD* factors in our case -- and
25   we've hit on the fact that you don't have to come out of

1    pocket.  And it was important for us, when we negotiated this

2    deal and finalized it, that they wouldn't have to pay shipping

3    and they wouldn't have to pay tax.

4         The range of 41 products is incorrect.  We looked at

5    the website today.  The least choice that you might have is the

6    Florida warranty class, which is 61.  And, again, 28 percent

7    will be able to receive hundreds and hundreds of items because

8    of the multiple vouchers.

9         In the other classes, you get to choose from

10   600-or-so products.  And they're not just T-shirts or Croakies.

11   There are the cooler cup holders.  There are coolers.  There

12   are backpacks.  There are shirts.  There are performance

13   shirts.  There are sunglass accessories.  There are all sorts

14   of things from these class members to choose from.

15        And they like these products.  In terms of the

16   flexibility, the last and, some courts say, the most important

17   factor, I think we satisfy that with flying colors, because you

18   don't need to go shopping with a physical coupon, for one.

19        And I know Judge Posner in *Redman* was opposed to the

20   $10 Radio Shack coupon, because it said you've got to have the

21   piece of paper and you've got to find a retailer that may be

22   150 miles away and you've got to remember to bring this thing

23   with you.  And that's not even worth the $10, having to do

24   that.

25        Here you're at home.  You're shopping from home.

1    You're not paying a penny.  You're going through all the

2    products available to you.  You can use them for any promotion

3    or any sale.  Like, for instance, today everything on Costa's

4    website is 25 percent off.  There's no restrictions on that, no

5    blackouts.  And a vast number of class members will be able, in

6    fact, to receive a windfall in new sunglasses.

7           So there is nothing inflexible whatsoever about these

8    vouchers, except that they --

9           THE COURT:  Is there -- is there some -- because

10   the -- the $12 million that you're seeking is premised as if --

11   as if this -- whatever the number is, whether it's 73 or it was

12   60 or 40, what -- you know, we -- whatever, it's -- it's acting

13   as if it's the same as cash, and that justifies, as I

14   understand it, the $12 million.

15          And I understand that the Eleventh Circuit says you

16   can't -- you base it on the total amount, not the -- not the

17   redemption rate.  But I had a -- a securities settlement that I

18   think you cited in your brief.  It was the *Rayonier* case.  And

19   it's the one that comes to my mind.  And I think there's been

20   others.

21          In the *Rayonier* case, Rayonier ponied up $73 million.

22   That was it.  They gave it up.  That money was going to go to

23   the class.  And then the question was:  What percentage of that

24   should go to the attorneys?

25          And I think I ended up, under *Camden* -- 25 percent

1    was the benchmark.  I think I ended up giving, maybe, 30.  They

2    asked for 33 and I think I gave them 30, something like that.

3         It was a lot of money.  It was still $20 million or

4    something.  So it was a ton of money but -- but there was

5    actually $73 million in cash that -- that was available and

6    then, minus the attorneys' fees, was given to the class.

7         So what's making me think about this is you're

8    telling me the value of this relief is now $73 million and you

9    want $12 million out of that.  But it's not the same thing.

10        It's $73 million worth of vouchers and injunctive

11   relief and other things that I'm sure have a cash value, but

12   the -- but the cash value is not $73 million, and yet the

13   attorneys' fees are being premised on it being the equivalent

14   of cash.

15        And if my premise is wrong, tell me, but that's --

16   I'm just trying to understand how -- how that works.

17        MR. HARGITAI:  Okay.  I think that's a very fair

18   question, Your Honor.  And I think the answer to it is within

19   Your Honor's sound discretion.

20        Let me suggest something to the Court.  First and

21   foremost, my team is not here to make a ton-of-money windfall.

22   This is a large amount of money.  But the class's receipt of

23   these benefits trump what we're asking for all day every day.

24        One way to look at this and to rule within the

25   parameters of the Eleventh Circuit, because we firmly

1    believe -- this is a common fund settlement, that's true.   It

2    is not a coupon settlement, that's true.   But it's not as good

3    as the settlement that Your Honor approved in *Rayonier* in that

4    that was a handsome sum of cash.

5         What we would ask for, Your Honor, is to analyze that

6    in the form of the benchmark that you award us.   So, for

7    instance, you take the pool of benefits that's available to the

8    class, which is required to be done under the Eleventh Circuit,

9    and you say is this worth 30 percent?   Maybe not.   Is this

10   worth 25 percent, your average case?   Maybe not.

11        And Your Honor will determine what benchmark is

12   appropriate for the type of relief that we have delivered to

13   this class.   And we have every confidence that Your Honor will

14   do that and do that appropriately.   And we won't -- certainly

15   not take offense to any haircut that you provide to us under

16   the circumstances.

17        We also ask, though -- because what we're not

18   interested in is the objectors taking this on to a meritless

19   appeal.   And that's why we've come forward to Your Honor with

20   the supplemental materials on lodestar, because we think that

21   with an appropriate multiplier -- and, again, within the

22   Court's discretion as to the value of this deal, we believe

23   that they would be one and the same and, therefore, there's

24   nothing to appeal.

25        THE COURT:   So you're -- and that's what -- is that

1   what *Parsons* did?

2          MR. HARGITAI:  Yes.  That is precisely what *Parsons*

3   did.  And, you know, objectors are well aware of this.

4          In *Lumber Liquidators*, for instance, the Fourth

5   Circuit held that the -- it reversed the district court and

6   said *Lumber Liquidators* is a coupon, and for good reason.

7   Because you had to come out of pocket to get a floor to have a

8   remedy.  What good are flooring products if your floor is

9   defective?  And it wasn't flexible.

10         But in *Lumber Liquidators* -- it went up to the

11  Fourth.  The Fourth said, you know, "We're not going to rule on

12  whether 17(a) is mandatory or whether the district court can

13  apply 17(b).  We're going to leave that to our distinguished

14  colleague in the district court."

15         I think I quoted that verbatim.

16         It goes down to the district court, the Bandas

17  firm -- Mr. Clore was involved in that.  And the district court

18  awarded the exact same amount of money under a lodestar.

19         And so we're asking the Court to look at this in such

20  a way that we can get these benefits to the class.  And we're

21  not concerned if you need to cut our fees some as a percentage

22  and cut it some in a lodestar to do that.

23         We are not here barking for a giant fee.  We agree

24  that $12 million is a big number.  We are very proud of the

25  work we did.  But we don't want to see this case go off in

1    another direction.

2         THE COURT:  All right.  And two questions.  If I were

3    to accept your idea of -- of the alternative ruling, would that

4    alternative lodestar analysis be premised on an

5    alternative -- even if it is a coupon settlement and we have to

6    use the lodestar, I end up in the same place?

7         Is that -- do you have -- because if it's -- if it's

8    a common fund, the Eleventh Circuit kind of almost says you

9    can't use a lodestar, right?  They say you're supposed to use

10   the -- the percentage.

11        MR. HARGITAI:  If I may, that depends on whether it's

12   a coupon or not, right?  I think Your Honor's ruling as to

13   whether it's a coupon -- if it's not a coupon, Your Honor is

14   absolutely right.  The Eleventh Circuit is bound to follow the

15   Court's discretion.

16        If the Eleventh Circuit deems or Your Honor deems

17   this to be a coupon -- and we believe it isn't -- then under

18   CAFA, 1712(b), the Court is expressly allowed to award a

19   multiplier.

20        THE COURT:  So if it's a common fund, non-coupon

21   case, then it's a percentage?  If it's a coupon case, then

22   I -- under 1712(b), I would use a lodestar?

23        MR. HARGITAI:  Your Honor has the discretion to do

24   that.  We would ask this Court to exercise that discretion.

25        THE COURT:  Okay.

1          MR. HARGITAI:  And here's -- here's one logical

2    reason that no one has brought up.  Because this is a common

3    fund -- and let's say, for instance, Your Honor awards us

4    $11 million of attorneys' fees, and there's a million dollars,

5    that goes to adjust these vouchers.  So it's a logical

6    impossibility.

7          THE COURT:  Is that -- is that clear -- I -- I guess

8    we could find it.  But it says any reduction in the fees will

9    inure to the benefit of the class.  Is that -- you're telling

10   me the understanding you-all had is that it would go back into

11   the vouchers?

12         MR. HARGITAI:  Yes, that is.

13         THE COURT:  I guess one problem with that is that

14   that -- doesn't that help Costa out?  Because instead of a

15   million dollars in cash, they've just now given a million

16   dollars more in vouchers, but they're not necessarily going to

17   suffer a million dollars' worth of -- in other words, it's not

18   the same thing, is it?

19         MR. HARGITAI:  Your Honor, if -- you know, if I were

20   a dishonest person, I would say make them pay it, but that

21   is -- that was the gist of our agreement.  It wasn't to benefit

22   Costa.  That is just the way we agreed to it.

23         I wish Costa would have to pay the $10 million in

24   cash out, or even more.  But, honestly, that's -- that's the

25   way we had discussed it.

1          THE COURT:  So anything that I give less than

2     $12 million to you or to your firm -- so let's say it's

3     $2 million less, so it's -- let's say it's 10 million and it's

4     2 million less.  That goes back into the voucher pool and

5     increases the amount of the vouchers by whatever the factor is,

6     but Costa has -- that's -- that's a windfall for Costa, isn't

7     it?

8          Because instead of actually paying out 2 more million

9     dollars in cash, they've now got this voucher thing, which I

10    think we can all agree, based on redemption rates and based on

11    other factors, is not the same as cash.

12         MR. HARGITAI:  That is true, Your Honor.  But, again,

13    back to the Eleventh Circuit precedent, it's about what's made

14    available to the class, not redemption rates.

15         It is -- like Your Honor noted when talking with the

16    objectors, we did the best to negotiate the best deal we could

17    under the circumstances, considering the risks inherent in all

18    three cases, advocated zealously to get where we got to, and

19    that's where we are.

20         We -- we certainly don't intend to give anybody a

21    windfall.  We don't think that it's going to be a windfall.  I

22    mean, everybody -- well, 99.5 percent of folks in the

23    claims-paid side know that their vouchers are coming.  That's

24    pretty impressive, I would submit to the Court.

25         THE COURT:  But you and I can agree that even if

1   100 percent of the people cash in vouchers, a $20 voucher

2   doesn't cost Costa $20.

3          MR. HARGITAI:  Yes.  That's indisputable.  Yes.

4          THE COURT:  Okay.  All right.  Go ahead.

5          MR. HARGITAI:  So we've talked about the *Online DVD*

6   structure.  The case cited by Mr. West, the *Office Max* case,

7   the reason that was deemed a coupon was because it was only

8   redeemable in California.  What good is a voucher going to be

9   if you've got to go to California to redeem it?  That was an

10  easy one.

11         And one of the -- one of the sort of tricky issues on

12  the coupon issue is that the objectors -- they want to rely

13  upon *Lumber Liquidators* or *Southwest* or *Multi-Cinema*, but those

14  are sort of a tricky batch of cases, in that, yes, the voucher

15  enables you to get something for free, but not really.

16         So, for instance, going backwards in the

17  *Multi-Cinema* case, you got a free -- a free popcorn at the

18  movie theater.  But that's really a discount, because you have

19  to pay the price of admission to get your popcorn; or the free

20  voucher on the Southwest flight, but you've got to buy an

21  airline ticket to use it; or the free flooring products, but

22  you've got to buy a floor so that they're useful.

23         That's not the case.  We don't have defective

24  sunglasses.  Costa is a good brand.  Costa sunglasses aren't

25  inherently defective.  It was the fees they were charging to

1    fix them that was a problem.

2           And so a consumer doesn't have to come out of pocket

3    under any circumstances to take advantage of this credit or

4    free money.

5           And one thing that is true, it doesn't matter whether

6    you call it a voucher or a gift card or a credit.  What matters

7    is how it operates.  And we think this operates in a way that

8    is -- should not be deemed a coupon under the various cases and

9    under the legislative intent.

10           Another point that is made by the objectors is what

11   law governs.  And it's very clear in *Whirlpool*, a case that I

12   believe all three sets of objectors were involved in, that the

13   plain language of CAFA makes clear that attorneys' fees

14   provision in CAFA preempt any corresponding state law.

15           They made that argument, though, so they could cite

16   to Florida state law and suggest that a multiplier in the range

17   that we're seeking is unavailable.

18           That was a misstatement as well.  Because the Florida

19   Supreme Court in *Kuhnlein* has said that in Florida, under our

20   state rules, that you can obtain a multiplier of five X.

21           And then *Parsons*, which is the federal court -- and

22   federal court -- federal law controls under the circumstances.

23   That court did us a huge favor in collecting all of the

24   authorities and cases, and providing us with an average

25   multiplier in complex commercial cases, which was 3.89, Your

1  Honor.

2          And so back to my suggestion, we would like a 3.9

3  multiplier.  We'd like the 4.2 to arrive us at the $12 million.

4  But our feelings aren't going to get hurt if, on the

5  alternative side, you award a lodestar that is less than that.

6          And so back to what we're asking for, because I think

7  that's important for the Court's consideration, we've brought a

8  lot of value to the Court.  It's capable of being measured in a

9  number of ways.  We'll leave that to the Court's discretion.

10  And that's why we've given you the stats page.

11          We would like Your Honor to approve the settlement

12  agreement.  We do not think there's any evidence of collusion,

13  you know, anything like that at all.

14          We'd ask that the Court find, consistent with its

15  earlier ruling and the homework that the Court did on that

16  issue, that this is not a coupon case on balance and award us a

17  percentage of the fund that Your Honor feels is appropriate

18  under the -- the benchmark provided by the Eleventh.  Up or

19  down makes no difference to us.  We want an end to this case

20  and we want to be paid reasonably.

21          We'd ask to eliminate an appeal, that Your Honor,

22  with the tools we provided, rule that even if this were a

23  coupon case, and it is not, that we would be entitled to X

24  amount of fees under a lodestar analysis.

25          We'd like to put an end to this case.  We want to get

1    these benefits in the hands of the class members.

2         Thank you.

3         THE COURT:  Thank you.

4         MR. HARGITAI:  Oh, if I may, Your Honor, I received a

5    note from my team here, which I think is an important issue

6    to -- it will take me a second.

7         THE COURT:  Sure.

8         MR. HARGITAI:  As you recall, Your Honor called us,

9    back when the *Johnson* opinion came out, about the incentive

10   awards to the class representatives.

11        As you know, the Eleventh is considering taking that

12   en banc.  What we would propose to do is for Costa to hold that

13   money.  It's $30,000, which if the court doesn't take it

14   en banc, goes to the cy-pres fund.  If it does take it en banc,

15   it can go to these representatives, who, by the way, all

16   participated in extensive written discovery, all had their

17   depositions taken in these various cases.

18        THE COURT:  Thank you.

19        MR. HARGITAI:  Thanks.

20        THE COURT:  Ms. Holladay, what -- what would you like

21   to add?

22        MS. HOLLADAY:  Hopefully I'll be short.  I know we're

23   getting late on time.  But a few things that I did want to

24   clarify from Costa's perspective, it has been alluded to that

25   this is a windfall to Costa or that this is a nuisance

1   settlement.  And from Costa's perspective I can say it's

2   emphatically not.  This was a very hard-fought battle on both

3   sides.  It was a very hotly contested and negotiated

4   settlement.  And it's -- it's a lot of money.  It's 40 million.

5           In addition to the actual vouchers that we've talked

6   a lot about here today, we're paying shipping and handling.

7   We're guaranteeing free shipping and handling.  And we're also

8   paying any taxes, to the extent that those become due in

9   states, so that the plaintiffs and the class members do not

10  have to pay them themselves.

11          And I wanted to briefly address how we came up with

12  the voucher amounts, because I think that's also important.  We

13  took a hard look -- both sides took a hard look at the online

14  products and what was available at different price points.

15          And what we attempted to do in setting the voucher

16  amounts is provide as many products as we could for the size of

17  the class, within the MSRP available on the particular website.

18          I know there were some issues raised in some of the

19  objectors' briefings about the 99 cents marketing value.  But

20  the reason some of the vouchers end in 99 cents or has specific

21  amounts is because we were trying to eliminate as much as we

22  could of a residual value so that the class members are able to

23  use the entire voucher, as much of the voucher as they deem

24  they want to use.

25          And so if Your Honor decreases attorneys' fees and

1 those amounts go back into the vouchers, we would, again,

2 undertake that same analysis to try to get the vouchers up as

3 high as we can so that whole products can be obtained by the

4 class.

5        On the cy-pres, the reason that we don't have a

6 definitive amount is because it largely depends on what Your

7 Honor does here today with the fees, and then also with the

8 incentive payments themselves.

9        It also depends on -- right now the class

10 administrator fees are about $435,000.  So that's also paid in

11 cash out of the fund, provided that holds true and nothing

12 increases there, such as if we had to do another notice

13 campaign, which I think would actually be required if a portion

14 of the attorneys' fees were to be suggested by the Court to be

15 paid in cash instead of wrapped into the vouchers.

16        I think under due process, because part of the class

17 members were claims made, that you would have to do another

18 notice campaign.  So that would obviously increase any costs of

19 administration, thus less amount available to the class

20 members.

21        But we would undertake a similar review to try to get

22 the vouchers up as high as possible and reduce the cy-pres,

23 because we want as much to go to the class members as possible.

24 Ideally the cy-pres would be zero, because the entire benefit

25 is going to the class.

1          On the cy-pres issue as well, the cy-pres was

2    contemplated by the parties to benefit the class in terms of

3    charities that Costa customers have proven over the years that

4    they support.

5          Costa has various charities and sells various

6    sunglasses to support charities for clean waters, oceans, and

7    sustainable fishing.

8          And so all of the charities that we have proposed and

9    that Costa intends to utilize would fit that purpose, and that

10   purpose being what is important to our customers.

11         The amount that would go to the various cy-pres

12   recipients, again, as I stated a moment ago, would vary,

13   depending on if we're able to exhaust the settlement fund for

14   the benefit of the class or whether it would have to revert via

15   a cy-pres.

16         And then the last thing I wanted to note is that, as

17   Mr. Hargitai stated, this case was not about defective

18   sunglasses.  This was about fees and whether or not the fees

19   were proper.

20         The fees in this case, across all three cases, range

21   anywhere from $2.95 upwards to $89.  And so when you're looking

22   at the value provided to the classes, we think we're well

23   within the range of a very good settlement, and certainly very

24   close to, if not exceeding, what Costa thought would happen at

25   trial.

1        So from those perspectives, we would just ask that

2   the Court approve the settlement.

3        THE COURT:  So let me just follow up on that question

4   I asked Mr. Hargitai.  If the Court were to determine that the

5   fee should be less than the requested $12 million -- so let's

6   say it's $2 million available, what -- by what mechanism would

7   that be cranked back into the voucher system?

8        MS. HOLLADAY:  So it would be distributed amongst the

9   classes based on -- it couldn't be a straight per rata for the

10  warranty class especially, because they're already at the top

11  end of the value.  They're already getting over 100 percent

12  recovery, as Mr. Hargitai noted.

13       But it would be distributed between the repair and

14  purchase classes accordingly, and based on the numbers that we

15  have.

16       THE COURT:  Is it fair to say that that would have to

17  be the product of some thought and analysis?  In other words,

18  there's not a preordained formula in the agreement or that's

19  been agreed to as to how that would look?

20       MS. HOLLADAY:  So what I can tell Your Honor, and

21  we're happy to share this with the Court, is what the parties

22  have been utilizing is a spreadsheet that, as we had the final

23  claims numbers, with the costs of administration -- and then

24  there are variable fields for attorneys' fees and then

25  incentive awards.  And we also have an MSRP list.

1        And so we're able to change those variables to get to

2  a final number once we have, kind of, what Your Honor decides

3  to do on the fees and on the incentive awards in particular.

4  And then it also shows what the delta would be for a cy-pres.

5  So we have that.  We're happy to share that with the Court.

6        THE COURT:  Okay.  Thank you.

7        MS. HOLLADAY:  Thank you.

8        THE COURT:  We're over budget here a little bit.  It

9  was -- I kind of budgeted a two-hour hearing.  But I want to

10 make sure that I've heard what I need to hear, so...

11       So, Mr. Isaacson, you've now heard the

12 presentation -- presentations.  I'm going to just give you a

13 few minutes to make a couple of points that you want to make.

14 This is going to be brief.  If you go longer than I had in

15 mind, I'll tell you.

16       Go ahead.

17       MR. ISAACSON:  Thank you very much, Your Honor.

18       The first point I need to make is that footnote 14 of

19 *Johnson versus NPAS Solutions* holds that *Perdue* does not

20 overrule *Camden I*, and remands -- says that *Camden I* shall be

21 applied on remand, despite arguments that it's inconsistent

22 with *Perdue*.

23       Now, that also cites *Home Depot*, which says that

24 *Perdue* is relevant even where it's not technically controlling.

25 And what *Perdue* is -- or is relevant to is that it holds that

 1  counsel's unenhanced lodestar is presumptively sufficient to

 2  attract and compensate counsel.

 3      Now, the Eleventh Circuit's opinion in *Waters* holds

 4  that you can have a cross-check of a percentage fee award

 5  against lodestar.  That's at 190 F.3d, at page 1298.  And in

 6  that case the cross-check showed that it was a modest lodestar

 7  multiplier of 1.05.

 8      Well, if it is only slightly more than the lodestar,

 9  you can approve a percentage fee award, is what *Waters* seems to

10  be saying.

11      Now, the Court has a fiduciary duty to the class.  In

12  light of that fiduciary duty, I think it should not award a

13  substantial multiple of what *Perdue* -- the Supreme Court says

14  is the amount that's needed to attract and compensate capable

15  counsel.  I think that's why *Perdue* is relevant, even though,

16  according to footnote 14, it does not overrule *Camden I*.

17      And I'd also like to point out that the settlement

18  agreement in -- at docket entry 98-1, colon -- or page 27,

19  section IXD says, and I quote, "The equitable common funds

20  doctrine does not apply to this settlement," period, end quote.

21      If it doesn't apply to the settlement -- it doesn't

22  say it doesn't apply to this paragraph of the settlement.  It

23  says it does not apply to this settlement and class members are

24  entitled to have that provision enforced with respect to

25  that aspect of it.

1          THE COURT:  Well, isn't that under the section about

2    objections, though?  I mean, I know you mean --

3          MR. ISAACSON:  It is under the section about -- it is

4    under the section about objections, that is correct, Your

5    Honor.  But its meaning is pretty clear.  It doesn't say under

6    this paragraph or this provision.  It says that the equitable

7    common fund doctrine does not apply to this settlement.

8          And in a way it's kind of like RICO, the Racketeer

9    Influenced Corrupt Organizations Act.  You apply it -- or what

10   it says about predicate acts.  You can go to legislative

11   history and find all kinds of statements about the mafia.  But

12   the fact is that if you've got the predicate acts, it applies

13   to legitimate businesses too.

14         I think that construing -- construing the -- any

15   ambiguity against the drafters, they cannot apply for a common

16   fund settlement under the settlement agreement.  And I think

17   those are the points I need to make, Your Honor.

18         I thank you.

19         THE COURT:  So what -- so what -- I'm just thinking,

20   Mr. Isaacson.  What if I end up approving the settlement but

21   reducing the amount of fee that -- that class counsel is

22   seeking and so now I've got money left over?  What's your

23   observation about what should happen to that money?

24         And, secondly, if I'm understanding correctly,

25   objectors sometimes seek a fee for their work if they've

1    brought some value.  Where does that money come from?

2            So those are my questions.

3            MR. ISAACSON:  Well, they say it's a $40 million

4    common fund.  I would assume that it would come out of the

5    reduction of the attorneys' fee amount.

6            If you've got $12 million in cash -- I guess the

7    cy-pres distribution is cash too, so it's like 13 million in

8    cash in this pseudo common fund.

9            If you were to reduce the attorneys' fees from

10   $12 million to $2 million, that would confer a $10 million

11   benefit in the class, which I think, because that is cash and

12   because the settlement agreement says it inures to the

13   benefit -- any reduction inures to the benefit of the class, I

14   think it distributes -- gets distributed as cash.

15           At that point objectors' counsel would come in with,

16   I would hope, their lodestars and make an application for what

17   you think is an appropriate amount of attorneys' fees in light

18   of any benefit that they have contributed to the class.

19           THE COURT:  All right.  Thank you.

20           Mr. West, did you have any --

21           MR. ISAACSON:  Thank you, Your Honor.

22           THE COURT:  -- did you have anything you wanted to

23   say?

24           MR. WEST:  Yes, Your Honor.  Just a couple very brief

25   points.  I was checking the website while Mr. Hargitai was

presenting.  I couldn't find a pair of sunglasses on Costa's website less than $159.  There is a 25 percent sale going on apparently, so you can get that pair of glasses for $119.

And class counsel touted that as, "Hey, these coupons are worth even more, because everything is on sale right now." And I think that underlines the extent to which this is a coupon, because it diminishes the value of the coupon to changing sales from Costa.

You know, if you've got a 25-percent-off sale this week and next week you don't, the -- the value of that coupon, since it's not exchangeable for cash, it's not usable anywhere else other than Costa, is uniquely tied to whatever Costa deems a sale day.

And so regardless, there's no evidence before the Court of what the -- the actual cost of any sunglasses are or when Costa is going to have a sale or when they're not going to have a sale.  And so that's why we think it goes back to, "Let's look at the redemption value of the coupons in reality."

And, again, that ties into even applying a lodestar method.  One of the considerations in evaluating a lodestar and a multiplier, if any, is the -- the degree of success.  And that is entirely dependent upon the redemption value for the coupons, which we believe on its best day is 10 percent.

I believe Mr. Miorelli said 3 percent.  And I believe that's probably more accurate.  But on its best day,

1   10 percent.

2           And without that evidence of the redemption value --

3           THE COURT:  Is that -- you think that's going to be

4   true if the -- if the vouchers are actually sent directly to

5   people, as opposed to a claim having been made?

6           MR. WEST:  Well, I believe that's one of the -- one

7   of the issues that we've got in a -- in an absence of expert

8   testimony or evidence that's been presented by class counsel on

9   how these coupons are going to be used.

10          THE COURT:  I wonder -- I wonder -- because I'm sure

11  all of you have had this happen.  I wonder what the percentage

12  of people who don't even cash the check when they send you the

13  money -- right?

14          You know, I got a check for $6.38 for something.  And

15  I'm not sure I remembered to cash it.  I wonder -- you know,

16  we're talking about vouchers versus money.

17          But the percentage -- I'm guessing if somebody sent

18  you $10, maybe there's more likelihood you cash the check than

19  if somebody sends you a $10 voucher.  But I don't know.

20          MR. WEST:  This is purely anecdotal, but just for the

21  Court's amusement, I had USAA insurance for a period of several

22  years.  I stopped using them years ago.  I received a refund

23  check in the mail two days ago for $1.73.  And you know what,

24  I've got an app on my phone.  I scanned it.  It's in my bank

25  account.  It's so easy to do these days.

1      THE COURT:  Yeah.  I guess that's the modern way to

2 do it.  I'm not that modern.  But, yeah, okay.

3      MR. WEST:  But that's all I wanted to add, Your

4 Honor.  Thank you.

5      THE COURT:  All right.  Thank you.

6      Mr. Miorelli, do you have any final thoughts for me?

7      MR. MIORELLI:  Yes, Your Honor.  Thank you for

8 hearing me again.

9      I would just point out that there's still, even with

10 the stats page, no evidence before the Court of what the value

11 of this case was, what the value of the coupons actually are

12 going to be.

13      The 1.6 million in sales tax and the 17 million, I

14 mean, I think we covered that in our objection.  I don't think

15 those are worth anything, because the sales tax isn't owed,

16 certainly not by a Florida class like my client.

17      And you're right, the 3 percent redemption rate means

18 that a million dollars taken out of class counsel's fee is a

19 $970,000 windfall to Costa.

20      And just on -- and the final thing is your point

21 about cashing checks.  I was involved in a case.  It's called

22 Sony PS3 "Other OS".

23      At the end there were about $600,000 in unclaimed

24 checks and there were attempts to send that out as a cy-pres.

25 And we successfully convinced the court in the Northern

1   District of California to send another round of smaller checks

2   to the class because that actually benefits the class.  And

3   that's what the Court is here to do.

4           Thank you, Your Honor.

5           THE COURT:  Thank you.

6           Mr. Hargitai, any last words of wisdom, sir?

7           MR. HARGITAI:  I'm just doing -- yes.

8           THE COURT:  It's not required.

9           MR. HARGITAI:  No.  I just want to clear up a point,

10  Your Honor.  I just showed objector's counsel from the website

11  that you can actually get glasses today from $78.

12          THE COURT:  So it's going down.

13          MR. HARGITAI:  It is, yeah.  Apparently it was

14  just -- he just didn't look at the sales page.

15          THE COURT:  All right.  Well, I don't think that's

16  going to determine much, but I appreciate you letting me know.

17          I also saw, I guess, a footnote that you wrote that

18  said -- because your -- your opponents were making much of the

19  fact that the free shipping is -- is -- is not as big a deal as

20  it might be, because I guess they're offering free shipping

21  right now.  I don't know for how long, but -- March 16th, I

22  think it was, they started offering free shipping.  I don't

23  know if that's just a special or if that's going to be the way

24  it is from now on, but...

25          Anyway, it's -- all right.  Ms. Holladay, anything

 1    else you wanted to say?

 2         MS. HOLLADAY:  I do not have anything else, Your

 3    Honor.  Thank you for your time.

 4         THE COURT:  Thank you.

 5         MR. HARGITAI:  Your Honor, a point of housekeeping,

 6    I -- I know that the last time we were here Your Honor asked

 7    for all the help that you could get.

 8         If you would like us to assist in preparing an order,

 9    with -- obviously for blanks and any attorneys' fees stuff,

10    we'd be happy to assist in that regard.

11         THE COURT:  All right.  I'll think about that.  Thank

12    you.

13         MR. ISAACSON:  This is Mr. Isaacson.  If a proposed

14    order is submitted, I request that it be served on objectors'

15    counsel as well.

16         THE COURT:  Oh, sure.  Yeah.  We don't -- we wouldn't

17    do it otherwise.  I don't -- you know, as you know, the federal

18    court normally, and the local rules, don't normally contemplate

19    proposed orders.

20         But sometimes, if -- if there's technical matters

21    that need to be in an order, or if we need to have some

22    template, sometimes we'll ask for them.  But certainly it would

23    be on notice and everybody would get copies.  So don't worry

24    about that.

25         MR. ISAACSON:  Thank you, Your Honor.

1          THE COURT:  Okay.  Well, I guess I've got to figure

2    it out, don't I?  So I will -- I appreciate the help.  I'm -- I

3    appreciate the help.  And I'll do the best I can to -- to

4    render an appropriate order and then we'll go from there.

5          And I can't exactly tell you when that's going to be.

6    I know the matter has gone on for a while.  But obviously we're

7    talking about a substantial settlement and there are

8    substantial issues here that I've got to think about.

9          Obviously I know I preliminarily approved the

10   settlement, but the -- the rules permit objections.  They've

11   been made.  I have to think about that.

12         There were -- there were issues I was thinking about

13   all along that have been brought to fore by the objectors.

14   Whether or not that's going to change my mind about the

15   settlement, I can't say right this minute.  But I'm just going

16   to have to think about it and probably write an opinion and

17   work through the issues.  So I will do the best I can.

18         I know that the area of class action law seems to be

19   evolving quickly.  I know the Eleventh Circuit is coming out

20   with cases, it seems like, every other day.  So I will count on

21   the parties to -- by way of notice of supplemental authority,

22   not additional briefing -- but by way of notice of supplemental

23   authority, if there's authority -- whether it be Eleventh

24   Circuit or around the country -- anything that you think would

25   help me or bear on the issues, I'd be happy to -- happy to

1  receive that.  And if I need any other help, I will let you-all
2  know.
3          All right.  Anything else from the parties today?
4          MR. HARGITAI:  (Shakes head negatively.)
5          MS. HOLLADAY:  (Shakes head negatively.)
6          THE COURT:  All right.  And, Mr. Isaacson, I'm
7  getting ready to adjourn the hearing.  Anything else, sir?
8          MR. ISAACSON:  No, sir.  Thank you very much, Your
9  Honor.
10          THE COURT:  All right.  Thank you all.  We're in
11  recess.
12          COURT SECURITY OFFICER:  All rise.
13      (The proceedings concluded at 4:22 p.m.)
14                         - - -
15
16
17
18
19
20
21
22
23
24
25

**CERTIFICATE**

UNITED STATES DISTRICT COURT      )
                                  )
MIDDLE DISTRICT OF FLORIDA        )


       I hereby certify that the foregoing transcript is a true and correct computer-aided transcription from the official electronic sound recording of the proceedings in the above-entitled matter.


       DATED this 23rd day of April, 2021.



          s/Shannon M. Bishop

          Shannon M. Bishop, RDR, CRR, CRC