# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

TROY SMITH, individually and on
behalf of all others similarly
situated, BRENDAN C. HANEY,
individually and on behalf of all
others similarly situated, and
GERALD E. REED, IV, individually
and on behalf of all others similarly
situated,

     Plaintiffs,

v.                                                            Case No. 3:18-cv-1011-TJC-JRK

COSTA DEL MAR, INC., a Florida
corporation,

     Defendant.

_____

# **O R D E R**

    After several years of litigation and extensive negotiation, three class action cases[1] against Defendant Costa Del Mar, Inc. have culminated in the settlement that is now before the Court for final approval. Upon review of the materials provided by Class Counsel and objections, the Court must determine whether the settlement is fair, adequate, and reasonable.

_____

    [1] See Haney v. Costa Del Mar, Inc., No. 16-2017-CA-004794-XXXX-MA (Fla. 4th DCA); Smith v. Costa Del Mar, Inc., No. 3:18-cv-1011-TJC-JRK; Reed v. Costa Del Mar, Inc., No. 6:19-cv-1751-RBD-LRH.

## I.    BACKGROUND

### A.    Settlement Terms

Plaintiffs in the three lawsuits that have been resolved through this consolidated settlement allege that Costa charged unlawful fees and related upcharges for repairs to and purchase of Costa sunglasses.[2] (See Doc. 98-1). For the purposes of settlement only and under Federal Rules of Civil Procedure 23(a) and 23(b)(3), the Court certified this litigation as a class action on behalf

---

[2] The first case, Haney v. Costa Del Mar, Inc., Case No. 16-2017-CA-004794-XXXX-MA, was filed on July 28, 2017 in the Duval County Circuit Court for the Fourth Judicial Circuit of Florida, alleging violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA) and breach of warranty under the Magnuson-Moss Warranty Act (MMWA). (Doc. 91 at 8). The claims arose out of Costa's promise that "if our sunglasses are damaged by accident, normal wear and tear, or misuse, we replace scratched lenses, frames, and other parts for a nominal fee," when in reality, Haney contended, those fees were larger than nominal. Id.

The second case, Reed v. Costa Del Mar, Inc., No. 6:19-cv-1751-RBD-LRH, was filed on April 3, 2019 in this district and was transferred from the Jacksonville Division to the Orlando Division. (Doc. 91 at 9). Reed alleged violations of FDUTPA from Costa's "nominal fee" language and sought to certify a nationwide class, excluding the Florida citizens accounted for by the Haney action, arguing that Costa's repair or replacement fees were beyond nominal. Id. Reed concerned only those customers whose sunglasses were repaired, whereas the Haney FDUTPA class involved all Florida consumers who bought Costa sunglasses, regardless of whether the sunglasses were ultimately repaired. Id.

The third case, Smith v. Costa Del Mar, Inc., No. 3:18-cv-1011-TJC-JRK, was filed on August 20, 2018 in this Court. Id. at 10. Smith alleged that a "processing fee" for repairs to sunglasses under Costa's unlimited "Lifetime Warranty" was a violation of MMWA requirements. Id. Smith sought to certify a nationwide class. Id. Extensive litigation had been conducted in all three cases by the time the parties reached a settlement, as discussed in more detail infra.

of the following classes: (1) Florida Purchase Class, or all citizens of Florida who purchased Costa plano[3] sunglasses from July 28, 2013 to January 31, 2018; (2) Florida Repair Class, or all citizens of Florida who purchased Costa plano sunglasses before January 1, 2018, and were charged a fee by Costa from July 28, 2012 through the date of the Court's final Order, to repair or replace their sunglasses damaged by accident, normal wear and tear, or misuse; (3) Nationwide Repair Class, or all United States citizens, excluding Floridians, who purchased Costa plano sunglasses before January 1, 2018, and were charged a repair fee from April 3, 2015 through the date of the Court's final Order, to repair or replace their Costa plano sunglasses damaged by accident, normal wear and tear, or misuse; and (4) Warranty Class, or all United States citizens who purchased non-prescription Costa sunglasses before January 1, 2016, and paid a warranty fee to Costa for repair or replacement of their sunglasses damaged by a manufacturer's defect from August 20, 2013 through the date of the Court's Final Order. (Doc. 102 at 4). Class Counsel estimates that combined, the classes include 2.1 million claims. (Doc. 91 at 6).

Costa has agreed to establish a settlement fund of $40 million (Doc. 98-1 at 15). As contemplated by the settlement agreement, the fund is meant to compensate class members with Costa product vouchers, provide incentive

---

[3] Costa "plano sunglasses" are Costa's non-prescription, non-promotional sunglasses. (Doc. 98-1 at 2).

awards to the three named Plaintiffs, pay Class Counsel for the approved attorneys' fees, expenses, and costs, cover costs of the notice program and claims administration, and fulfill a possible <u>cy pres</u> payment. <u>Id.</u> Estimated voucher amounts range from $8.99 to $22.99 per claim, depending on the class to which a claimant belongs. (Doc. 135 at 5). Vouchers are non-personalized, transferrable, stackable, and expire in two years, with Costa covering associated shipping, handling, processing charges, and sales tax for class members, and vouchers may be redeemed for items on Costa's website. (Doc. 98-1 at 18, 56; <u>see also</u> Doc. 91 at 6). The settlement also sets forth injunctive relief; Costa has modified its product packaging and marketing materials to eliminate "nominal fee" and "Lifetime Warranty" language. <u>Id.</u> at 4, 16; <u>see also</u> Doc. 91 at 6–7. Additionally, as part of the agreement, Class Counsel agreed to make, and Costa agreed not to oppose, an application for an attorneys' fees award of thirty percent of the settlement fund, approximately $12 million. <u>Id.</u> at 28. The settlement provides that "[a]ny reduction by the Court in the amount of Attorneys' Fees, Costs, and Expenses to be awarded to Plaintiffs' Class Counsel shall inure to the benefit of the Class." <u>Id.</u> at 29.

## B.   Approval Process Procedural History

The Court originally granted preliminary approval to the Amended and Restated Settlement Agreement (Doc. 98-1) on September 3, 2020. (Doc. 102). Before ruling on the motion for preliminary approval (Doc. 91), the Court <u>sua</u>

sponte raised the issue of whether the settlement qualified as a coupon settlement under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1712, and the parties provided additional briefing. (Docs. 97, 99).[4] The parties maintained that the settlement is not a coupon settlement and that, therefore, the mandates of CAFA do not apply. Id. Upon review of the parties' submissions at the preliminary approval stage, the Court was satisfied that the settlement was not a coupon settlement. (Doc. 102 at 4 n.1). Additionally, the parties submitted a joint statement (Doc. 107) regarding the impact of Johnson v. NPAS Solutions, LLC, 975 F.3d 1244 (11th Cir. 2020) on this case. The Court then changed the deadline for the motion for attorneys' fees to ensure adequate time for class members to object to the motion, as required by Johnson. (See Doc. 108).

Following preliminary approval, the settlement administrator carried out the notice program. (See Docs. 111-1; 98-1 at 20–23). The settlement administrator sent a summary notice and long-form notice to all class members, sent CAFA notice to federal and state officials as identified in 28 U.S.C. § 1715(a), and established a website with comprehensive information about the settlement. Id. Email notice was sent to class members with email addresses, and postcards were sent to class members with only physical addresses. (Doc.

---

[4] The Court also held hearings on the motion for preliminary approval on July 17, 2020 and September 1, 2020, the records of which are incorporated by reference.

111-1 at 4). Multiple attempts were made to contact class members in some cases, and all notices directed recipients to a website where they could access settlement information. Id. at 5. A paid online media plan was implemented for class members for whom the settlement administrator did not have data. Id. When the notice program was complete, the settlement administrator submitted a declaration stating that the notice and paid media plan reached at least seventy percent of potential class members. (Doc. 111-1 at 5). As of February 26, 2021, notices had been delivered via postcards or email to 939,400 of the 939,479 class members to whom the settlement administrator sent notice—a ninety-nine and a half percent deliverable rate. Id. at 8.

Currently pending in this case are: Class Counsel's Unopposed Motion for Attorneys' Fees and Expenses and Conditional Request for Incentive Awards to Class Representatives (Doc. 109); John W. Davis's Objection to Proposed Settlement (Docs. 112, 113) and Objections to Evidence (Doc. 114); the Objection of Austin Valls (Docs. 115, 125); Mitchell George Miorelli's Objection to Class Action Settlement (Doc. 117) and Motion to Strike or Exclude Declaration of Thomas Scott (Doc. 118); and Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. 135).[5]  Plaintiffs filed a Response to the Objections filed

---

[5]  A Costa customer who resides in Emerald Isle, North Carolina also wrote a letter to the undersigned, and the Clerk was directed to file the letter as an objection to the settlement. (Doc. 105). In the letter, the customer says that he "had a perfect relationship with the company" but suggests that the

by John W. Davis, Mitchell George Miorelli, and Austin Valls (Doc. 134) and a Response to the Objections to Evidence Filed by Objector Davis and the Motion to Strike Filed by Objector Miorelli (Doc. 137). Objector Valls filed a Response to Class Counsel's Motion for Attorneys' Fees and Expenses (Doc. 144).[6]

Other evidence before the Court includes the Declaration of Stefan Boedeker (Doc. 96-1); the Declaration of Cameron R. Azari, Esq. on Implementation of Settlement Notice Plan (Doc. 111); and supplemental documents (Doc. 133) in support of Class Counsel's Motion for Attorneys' Fees and Expenses, including the Second Supplemental Declaration of Peter Hargitai with timesheets for the <u>Haney</u>, <u>Reed</u>, and <u>Smith</u> actions (Doc. 131-1) and the Declaration of Barry Richard (Doc. 132-1). The Court held a final approval hearing on April 20, 2021, the record of which is incorporated by reference. (Doc. 146). Since that time, the parties have apprised the Court of

---

attorneys' fees, incentive awards, and small cash amounts to the class seem unfair. <u>Id.</u> The customer did not appear at the hearing.

[6] On April 12, 2021, Valls filed a Motion to Strike Class Counsel's Supplemental Fee Motion in Violation of Rule 23(h); or Alternatively, Motion for Leave to File Response, with his proposed response attached (Doc. 141, 141-1). In the motion, Valls requested that the Court either strike several supplemental filings from Class Counsel (Docs. 131, 132, 133) regarding the motion for attorneys' fees or, alternatively, provide Valls with leave to file a response in opposition to those filings. (<u>See</u> Doc. 141). Class Counsel filed a response expressing opposition to the motion to strike but no opposition to Valls filing a response. (Doc. 142). The Court declined to strike Class Counsel's supplemental filings but allowed Valls to file the response. (Doc. 143).

recent related case law by filing notices of supplemental authority.[7] (Docs. 148, 149, 150).

### C.   Objections to the Settlement

Federal Rule of Civil Procedure 23(e)(5)(A) affords class members who oppose the settlement the right to object. See In re Equifax Inc. Customer Data Sec. Breach Litig., 999 F.3d 1247, 1257 (11th Cir. 2021) ("Often times objectors play a beneficial role in opening a proposed settlement to scrutiny and identifying areas that need improvement.") (quoting David F. Herr, Annotated Manual for Complex Litigation § 21.643 (4th ed. 2021)) (internal quotation marks omitted)). This settlement generated eight requests for exclusion and six objections, four of which were filed with the Court and were therefore procedurally valid. (Doc. 135 at 8). Three Objectors in particular—John W. Davis, Mitchell George Miorelli, and Austin Valls—filed lengthy objections and appeared at the final approval hearing.

Objectors take issue with this settlement for numerous reasons. Objector Davis belongs to the Florida Purchase Class, the Florida Repair Class, and the

---

[7] Objector Miorelli filed a Local Rule 3.01(i) Notice of Supplemental Authority (Doc. 148) regarding Briseño v. Henderson, 998 F.3d 1014 (9th Cir. 2021); Class Counsel filed Plaintiffs' Notice of Supplemental Authority (Doc. 149) regarding In re Equifax Inc. Customer Data Security Breach Litigation, 999 F.3d 1247 (11th Cir. 2021); and Class Counsel filed Plaintiff's Notice of Supplemental Authority (Doc. 150) regarding Fruitstone v. Spartan Race, Inc., No. 20-cv-20836-BLOOM/Louis, 2021 WL 2012362 (S.D. Fla. May 20, 2021).

Warranty Class. (Doc. 113 at 2). He is a class action attorney who frequently practices in the Eleventh Circuit but retained counsel to appear on his behalf at the final fairness hearing. Id. at 3. Davis avers that he does not intend to seek money for his personal efforts but reserves the right to seek attorneys' fees if his objection "confers a substantial benefit on the class." Id. at 5. He argues that this settlement is a coupon settlement and must therefore adhere to the mandates of CAFA, including a lodestar-based attorneys' fees award without a multiplier. (Doc. 112 at 3–7). Davis maintains that the settlement protects Costa from significant liability and takes issue with the fact that vouchers expire after two years and can only be used for a subset of Costa's merchandise. Id. at 2–3. Davis also claims that attorneys' fees should be tied to the number of vouchers redeemed under CAFA, that the requested $10,000 service award for named Plaintiffs is improper, and that the settlement agreement provision limiting Objectors' counsel from retaining fees is unenforceable as against public policy. Id. at 4, 7, 12, 25. Additionally, in his Objections to Evidence, Davis claims that Boedeker, who provided an affidavit regarding the value of injunctive relief, makes unwarranted assumptions leading to an extremely inflated estimate,[8] and that the testimony of Thomas E. Scott, a former judge, who provided an affidavit saying the settlement was reasonable, should be

---

[8] Davis notes that Boedeker estimates the value of injunctive relief as between $47,618,189 and $58,210,558 for a two-year period. (Doc. 114 at 3).

stricken because "his opinion is not the proper subject of expert testimony" and because he did not analyze the settlement as a coupon settlement. (Doc. 114 at 4).

Objector Valls is a Nationwide Repair Class member. Similar to Davis, Valls argues that this is a coupon settlement more about a "marketing campaign than a disgorgement of ill-gotten gains." (Doc. 115 at 2). He believes more information is necessary before approval, including estimates of the vouchers' redemptive value, redemption rates, and the real monetary value of vouchers. See id. He also argues that the provision of the agreement saying that Objectors' counsel cannot recover fees should be void and that the cy pres should go to a charity aligned with the interests of the class and should cover all unexhausted funds instead of only $1 million. Id.

Objector Miorelli argues many of the same points, including that the settlement is a coupon settlement, that the value of the settlement is far less than Class Counsel claims, that the requested attorneys' fees violate CAFA and are excessive, and that the provision of the settlement barring fees for Objectors is unenforceable. (See Doc. 117). He also objects on the basis that the settlement is collusive under In re Bluetooth Headset Products Liability Litigation, 654 F.3d 935 (9th Cir. 2011), that the cy pres award is inappropriate, and that the Court does not have enough information about Class Counsel's purported costs. Id. Miorelli also submitted a Motion to Strike or Exclude the Declaration of

Thomas Scott, in which he argues that Scott's testimony includes impermissible legal conclusions, factual statements without foundation, and unreliable, unhelpful opinions. (Doc. 118). The Court has weighed these objections and analyzes them further <u>infra</u>.

In the Motion for Final Approval, Plaintiffs discuss why the settlement is fair, adequate, and reasonable, maintain that the settlement is <u>not</u> a coupon settlement, and argue that even if it were a coupon settlement, the requested fees would still be reasonable based on a lodestar calculation and an appropriate multiplier. (Doc. 135 at 26). Plaintiffs chose to file a joint response to the objections of Davis, Valls, and Miorelli. (Doc. 134).

## II.     DISCUSSION

### A. Initial Findings

i.     <u>The Court may exercise jurisdiction and finally certifies the settlement classes solely for purposes of settlement.</u>

The Court has jurisdiction over the subject matter of this action, and all matters relating to the settlement, as well as personal jurisdiction over Defendants and all settlement class members, including all Objectors, for purposes of the settlement. The Court finds that the settlement is the result of arms-length, non-collusive negotiations between experienced counsel, reached with the assistance of Terrence White, a reputable mediator. (<u>See</u> Docs. 135-1,

109-2). The previously certified class[9] set forth below is now finally certified, solely for purposes of this settlement, pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3):

**Florida Repair Class**: All citizens of the State of Florida who: (i) purchased Costa plano sunglasses before January 1, 2018; and (ii) were charged a fee by Costa, from July 28, 2012, through February 28, 2021, to repair or replace their Costa plano sunglasses damaged by accident, normal wear and tear, or misuse.

**Nationwide Repair Class**: All citizens of the United States (excluding citizens of the State of Florida) who: (i) purchased Costa plano sunglasses before January 1, 2018, and (ii) were charged a repair fee by Costa, from April 3, 2015, through February 28, 2021, to repair or replace their Costa plano sunglasses damaged by accident, normal wear and tear, or misuse.

**Florida Purchase Class**: All citizens of the State of Florida who purchased Costa plano sunglasses from July 28, 2013, to January 31, 2018.

**Warranty Class**: All citizens in the United States who: (i) purchased a pair of non-prescription Costa sunglasses prior to January 1, 2016; and (ii) paid Costa a warranty fee to repair or replace non-prescription sunglasses damaged by a manufacturer's defect from August 20, 2013 through February 28, 2021.

The Court finds that certification of these settlement classes solely for purposes of settlement is appropriate in that (a) the settlement classes are so numerous

---

[9] The parties elect to exclude from the class: "(1) Costa, any entity or division in which Costa has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the judge(s) to whom Litigation is or has previously been assigned and each judge's respective staff; (3) counsel for each of the Parties in this case; and (4) persons who timely and properly exclude themselves from the Class." (Docs. 98-1, 135 at 9 n.8).

that joinder of all members is impracticable; (b) there are questions of law and fact common to the settlement classes that predominate over any questions affecting only individual settlement class members; (c) the three named Plaintiffs' claims are typical of the claims of their respective settlement classes; (d) Plaintiffs have fairly and adequately protected the interests of the settlement class and will continue to do so; (e) Class Counsel is adequate; and (f) a class action is the superior method for the fair and efficient adjudication of this controversy.

Additionally, the Court affirms its determinations in the Preliminary Approval Order designating Troy Smith, Brendan C. Haney, and Gerald E. Reed, IV as representatives of the settlement classes and appointing Peter P. Hargitai of Holland & Knight, LLP, as settlement Class Counsel.

### ii.    The notice program was proper.

In the Preliminary Approval Order, the Court approved the proposed forms of notice to the settlement classes. (Doc. 102 at 6). [10] Notice was disseminated in accordance with the Preliminary Approval Order. Notice of a settlement must be reasonable, meaning that it must "fairly apprise the prospective members of the class of the terms of the proposed settlement and of

---

[10] At the Court's request, before preliminary approval, the parties revised the Settlement Agreement to provide for direct payment of claims (as opposed to opt-in) to the Florida Repair Class, the Nationwide Repair Class, and the Warranty Class. (See Doc. 98 at 1).

the options that are open to them in connection with the proceedings." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 114 (2d Cir. 2005) (quoting Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982)) (internal quotation marks and brackets omitted). Federal Rule of Civil Procedure 23(c)(2)(B) requires that notice be "the best notice that is practicable under the circumstances." Upon review of the notice materials (Docs. 98-4, 98-5, 98-6) and of Azari's Declaration (Doc. 111-1) regarding the notice program, the Court is satisfied with the way in which the notice program was carried out. Class notice fully complied with Rule 23(c)(2)(B) and due process, constituted the best notice practicable under the circumstances, and was sufficient notice to all persons entitled to notice of the settlement of this lawsuit.

**B. Fairness Findings**

Under Federal Rule of Civil Procedure 23(e), class actions may be settled "only with the court's approval," and notice of the settlement must be given to all class members. Settlements are a "means of amicably resolving doubts and preventing lawsuits." Miller v. Rep. Nat'l Life Ins. Co., 559 F.2d 426, 428 (5th Cir. 1977) (citation and quotation marks omitted).[11] Thus, they are "highly favored in the law and will be upheld whenever possible . . ." Id.; see also In re

---

[11] All Fifth Circuit decisions issued before October 1, 1981 have been adopted as binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Equifax, 999 F.3d at 1257. There is "an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." Lipuma v. Am. Express Co., 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citation and quotation marks omitted). "In considering whether to approve a proposed class action settlement, the court must strike a balance between a rubber stamp approval and the detailed and thorough investigation that it would undertake if it were actually trying the case." Radosti v. Envision EMI, LLC, 717 F. Supp. 2d 37, 50–51 (D.D.C. 2010) (internal quotation marks omitted).

To be approved, a settlement must be "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).[12] Additionally, the Eleventh Circuit has instructed district courts to consider:

---

[12] To determine whether a class action settlement is "fair, reasonable, and adequate," Federal Rule of Civil Procedure 23(e)(2) requires that courts consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> > (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). In evaluating these factors, "[a]bsent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" Nelson v. Mead Johnson & Johnson Co., 484 F. App'x 429, 434 (11th Cir. 2012) (quoting Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977)). The Court addresses each of the Bennett factors in turn.

i.   The likelihood of success at trial merits final approval.

In assessing whether the likelihood of success at trial merits final approval, "the Court can limit its inquiry to determining whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." Strube v. American Equity Inv. Life Ins. Co., 226 F.R.D. 688, 697–98 (M.D. Fla. 2005) (internal quotations omitted); see also In re Domestic Air Transp., 148 F.R.D. 297, 314 (N.D. Ga. 1993) (noting that the Court should consider "the likelihood and extent of any recovery from the defendants absent . . . settlement.").

Given the cases' duration and complexity, and the number of pending motions in this litigation at the time of settlement, whether Plaintiffs would

have succeeded at trial in the three underlying cases is uncertain. Among other issues, Haney hinged on a novel interpretation of FDUTPA regarding whether a plaintiff must prove that the whole class was uniformly exposed to a deceptive promise; an unfavorable ruling would have reversed the trial court's certification of the class, which was only an intermediary victory for Plaintiffs in the first place. (Doc. 135 at 15). The Reed lawsuit also involved significant disagreement about FDUTPA's application—if any—to consumers outside Florida. Id. At the time of settlement, a motion for class certification, a Daubert motion, and cross-motions for summary judgment were all pending in this Court in Smith. Id. Depending on the outcome of those motions, the class could have received no recovery whatsoever. The parties also vehemently disagreed about damages under FDUTPA, each having engaged its own experts, and about Costa's entitlement to charge consumers for incidental expenses. Costa's robust challenges to class certification and to the substance of Plaintiffs' claims, as well as the complexity of this litigation, posed substantial risks to the class. Additionally, Costa had already appealed class certification in Haney and would have likely appealed any adverse decisions in Reed or Smith, prolonging litigation, increasing expenses, and deferring any class benefit.

Ultimately, Plaintiffs faced major obstacles to obtaining relief. "The Court is not called upon to determine whether the settlement reached by the parties is the best possible deal, nor whether class members will receive as much from

17

a settlement as they might have recovered from victory at trial." In re Checking Account Overdraft Litig., 830 F. Supp. 2d 1330, 1345 (S.D. Fla. 2011) (citation and internal quotation marks omitted). Weighing Plaintiffs' chance of success at trial in the underlying cases against the benefits of the settlement leads the Court to conclude that the "certain, timely, and substantial relief" this settlement allows is fair under the circumstances. Tait v. BSH Home Appliances Corp., No. SACV100711DOCANX, 2015 WL 4537463, at *7 (C.D. Cal. July 27, 2015); see Bennett, 96 F.R.D. at 349–50.

    ii.    <u>Given the range of possible recovery, the settlement is fair, adequate, and reasonable.</u>

"The second and third factors in the Eleventh Circuit's Bennett analysis call for the Court to determine the possible range of recovery and then ascertain where within that range fair, adequate, and reasonable settlements lie." Garst v. Franklin Life Ins. Co., No. 2:97-cv-74-ELC, 1999 U.S. Dist. LEXIS 22666, at *64 (N.D. Ala. June 25, 1999) (citation and internal quotation marks omitted). In making that determination, the Court is mindful that "the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate . . ." Behrens v. Wometco Enters., Inc., 118 F.R.D. 534, 542 (S.D. Fla. 1988). Instead, a settlement is by its nature a compromise and should be appraised "in light of the attendant risks

with litigation." <u>Thompson v. Metropolitan Life. Ins. Co.</u>, 216 F.R.D. 55, 64 (S.D.N.Y. 2003).

Here, the range of recovery at trial differed by class. For the Warranty Class, the maximum possible recovery was $11.95 plus tax, or the amount Costa allegedly improperly charged for warranty repairs; the settlement recovery for the Warranty Class is a tax-free product voucher worth $8.99 per claim, plus free shipping and handling. (Doc. 135 at 17–18). For the Florida Repair Class and the Nationwide Repair Class, the amount of possible recovery was uncertain because it depended on a jury determination of what constituted a "nominal fee." For purposes of valuing injunctive relief, Plaintiffs' expert Stefan Boedeker surveyed two hundred consumers about what they viewed as a "nominal fee," and the average response was $25.45. (<u>See</u> Doc. 96-1 at 14). But that is only one estimate, and it is hard to know how a jury may have evaluated the issue. The Florida Repair Class and the Nationwide Repair Class receive vouchers of $22.99 through the settlement. Members of the Warranty Class, the Florida Repair Class, and the Nationwide Repair Class all receive vouchers without having to make a claim or take any affirmative action. (Doc. 135 at 19). Thus, $19.7 million in vouchers will automatically be distributed (though the amount of those vouchers that will be redeemed by class members remains to be seen). <u>Id.</u>

Lastly, for the Florida Purchase Class, the damages theory was not based on sending in glasses for repair, but rather on a perceived price upcharge or "premium" based on Costa's "nominal fee" repair promise. Plaintiffs state that their experts' estimation of the premium's value was incomplete at the time of settlement, but they remind the Court that Costa's expert, Hillary Ellner, claimed "the vast majority of consumers do not consider a warranty policy as a major reason for their purchase of premium products (excluding consumer electronics)." (Doc. 135 at 19). Due to less contact information about the Florida Purchase Class, class members must submit a claim to receive the settlement, and Plaintiffs aver that $7.5 million in vouchers will be distributed to those who made direct claims (and are therefore likely to redeem the vouchers). (Doc. 135 at 20). The Florida Purchase Class is provided with $12.00 vouchers through the settlement.

According to the claims administrator, thirty one percent of class members are eligible for multiple product vouchers. (Doc. 135-2). Thus, Plaintiffs emphasize that members of the Florida Purchase Class may claim vouchers for each pair of sunglasses purchased, and proof of purchase is not required unless class members claim over five vouchers. (Doc. 135 at 19). The claims administrator reports that eighty-seven percent of Florida Purchase Class members will receive more than one voucher, and forty-eight percent will receive five or more vouchers. Id. For example, according to estimated voucher

20

amounts and the Objectors' declarations, Plaintiffs aver that Objector Valls stands to receive $100.95 in vouchers, and Objector Miorelli can expect $127.96 in vouchers. Id. Though anecdotal, these facts lend credence to the idea that frequent Costa consumers will be likely to be able to purchase sunglasses or other substantial merchandise by stacking vouchers.

The Court finds that this relief to class members is reasonable in light of the range of recovery. Also, "[u]nder Eleventh Circuit law, injunctive changes . . . represent a benefit to the class and should be considered when approving a class settlement." Marty v. Anheuser-Busch Cos., LLC, No. 13-cv-23656, 2015 WL 6391185, at *2 (S.D. Fla. Oct. 22, 2015) (citing Poertner v. Gillette Co., 618 F. App'x 624, 629 (11th Cir. 2015)). Costa agreed to eliminate its "nominal fee" and "Lifetime Warranty" language from products and advertisements going forward as part of the settlement.

Estimates for the value of injunctive relief range widely. For example, Class Counsel's expert Stefan Boedeker used data from a survey completed by 200 participants to determine (1) how much value consumers place on a "Lifetime Warranty" versus a "Limited Lifetime Warranty," and (2) how consumers define and quantify the value of a "nominal" fee. (Doc. 96-1 at 8).[13]

---

[13] The surveys were targeted at consumers who had previously purchased Costa sunglasses. (Doc. 96-1 at 9). Boedeker concluded that "had Costa promoted a 'Lifetime Warranty' on future sales . . . it would have been able to command a 14.7% price premium" for sunglasses that were an average

Boedeker concluded that the potential monetary value of injunctive relief is between $47,618,189 and $58,210,558 when projected out for a two-year period using Costa's average annual sales data. Id. at 16. Boedeker focuses only on future losses (for a rather arbitrary two-year period) from the elimination of "Lifetime Warranty" and "nominal fee" language without considering past gains. His assessment is based on data from a relatively small sample size. The Court will not rely on this seemingly inflated and theoretical estimate for purposes of valuing injunctive relief.

On the other hand, Costa's Vice President and Controller Felicia Morrisey has said that the cost of replacing packaging and/or implementation of program

---

purchase price of $229.30. Id. at 10–11. He then projected out two years using Costa's annual average sales data to calculate his estimate of the total value of injunctive relief eliminating "Lifetime Warranty" language: $23,566,868. Id. at 11.

To determine the value of injunctive relief excluding "nominal fee" language, Boedeker relied on the analysis and testimony of Alexander Rey, a Certified Master Analyst of Financial Forensics, Certified Valuation Analyst, and Certified Fraud Examiner, who testified as an expert in the Haney case. Id. at 13. Rey determined the value of the nominal fee claim by calculating the average repair cost, subtracting a "nominal fee," and multiplying by the probability that a repair would be needed. Id. Rey found that the average repair cost a customer would pay for a single repair was $75 using Costa's historical repair data; Boedeker cross-checked and verified that analysis. Id. Rey did not opine on what constituted a "nominal fee." Id. Boedeker found through survey data that consumers' idea of a "nominal fee" ranges from $25.45 to $40.60. Id. at 14. Boedeker projected out two years using Costa's annual average sales data to calculate the total value of injunctive relief dropping "nominal fee" language: $24,051,321 to $34,643,690. Id. at 15.

22

changes costs $5 million at minimum for Costa. (Doc. 135-4 at 4). In his declaration supporting Class Counsel's motion for final approval, Scott says that Boedeker "placed significant value on the injunctive relief secured" and reiterates Morrisey's specific estimate that injunctive relief will cost Costa at least $5 million. (Doc. 109-1 at 13). The Court is satisfied that the injunctive relief is worth at least $5 million. This is another component of the settlement that increases its value and benefits consumers more broadly.

iii.   This litigation has become exceedingly complex, expensive, and time-intensive.

For this factor, the Court considers "the vagaries of litigation and compare[s] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." Lipuma, 406 F. Supp. 2d at 1323 (internal quotation marks and citations omitted). This litigation had lasted for three years when the parties reached a settlement, and many substantive motions remained pending. Resolution by any means other than settlement would require a much greater time expenditure. "Complex litigation . . . 'can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.'" Woodward v. NOR-AM Chem. Co., No. Civ. 94–0780–CB–C, 1996 WL 1063670, at *21 (S.D. Ala. 1996) (quoting In re U.S. Oil & Gas Litig., 967 F.2d 489, 493 (11th Cir. 1992)). Settlement, however,

"alleviate[s] the need for judicial exploration of these complex subjects, reduce[s] litigation cost, and eliminate[s] the significant risk that individual claimants might recover nothing." Id. Class Counsel has expended over 6,000 hours across the Haney, Reed, and Smith actions, and Costa's counsel devoted over 15,000 hours to the defense. (Docs. 109-2, 135 at 20–21). Extraordinary time and labor were expended to resolve these cases.

The settlement enables the parties to avert additional years of expensive litigation and enables class members to receive immediate, tangible relief. Thus, like the court in Lipuma, the Court concludes that "[w]ith the uncertainties inherent in pursuing a trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a resolution by way of settlement are apparent." 406 F. Supp. 2d at 1324.

iv.   Though Objectors took issue with the settlement, on balance, the settlement is fair, adequate, and reasonable.

The Court considers "the reaction of the class, as well as the reaction of the various state attorney generals and regulators, to the proposed settlement to be an important indicator as to its reasonableness and fairness." Braynen v. Nationstar Mortg., LLC, No. 14-cv-20726, 2015 WL 6872519, at *6 (S.D. Fla. Nov. 9, 2015) (quoting Hall v. Bank of Am., N.A., No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014)). "[A] low number of objections suggests

24

that the settlement is reasonable, while a high number of objections would provide a basis for finding that the settlement was unreasonable." Id. (quoting Saccoccio v. JPMorgan Chase Bank, N.A., 297 F.R.D. 683, 694 (S.D. Fla. 2014)). There were six total objections, three of which were extensive, out of 939,400 delivered notices. There were no objections from the United States Attorney General or from any state attorney general. Objectors constitute an exceedingly low percentage of the overall class such that, holistically, the reaction of the class weighs in favor of settlement. See Hall, 2014 WL 7184039, at *5 (finding "overwhelming support for the settlement and evidence of its reasonableness and fairness" where class members who objected comprised less than .0016 percent of the class and no state attorneys general or regulators submitted objections); Hamilton v. SunTrust Mortg. Inc., No. 13-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014) (finding that there was support for a settlement where no state attorneys general or regulators objected and when only one married couple, or .003% of the class, objected). But the Court also examines the merits of the objections.

Plaintiffs devote much of their written response to objections to contending that the three main Objectors "have made a practice of throwing a wrench into class action settlements and thereby delaying class member benefits, all in an effort to extort a payoff." (Doc. 134 at 2). Plaintiffs are not wrong. All three Objectors or their counsel have a history as "'serial' objectors."

See, e.g., Chambers v. Whirlpool Corp., 214 F. Supp. 3d 877, 890 (C.D. Cal. 2016) (affirmed in part, vacated in part, and remanded on other grounds in Chambers v. Whirlpool Corp., 980 F.3d 645 (9th Cir. 2020)); see also, e.g., Zepeda v. PayPal, Inc., No. C 10-2500 SBA, 2017 WL 1113293, at *9, *16, *22 (N.D. Cal. Mar. 24, 2017) (labeling Miorelli a "professional objector," overruling objections, and approving settlement); Muransky v. Godiva Chocolatier, Inc., No. 15-60716-CIV, 2016 WL 11601079, at *3 (S.D. Fla. Sept. 16, 2016) ("Plaintiff aptly characterizes . . . Mr. Isaacson and Mr. Davis as 'professional objectors' who threaten to delay resolution of class action cases unless they receive extra compensation."); Doc. 134 at 3–4, n.5 (citing at least five cases criticizing Bandas, the founder of the firm that represents Valls, as a self-interested serial objector). The Court remains cognizant of that history but nevertheless takes seriously its duty to ensure a fair settlement for class members and has extensively reviewed the Objectors' myriad arguments.

Ultimately, the Court finds that the Costa product vouchers are not coupons but understands that determining whether a settlement constitutes a coupon settlement under CAFA is a fact-specific inquiry, and this settlement presents a close call. Because that topic bears heavily on the issue of attorneys' fees, it is discussed at length infra, and other aspects of objections are discussed here.

All Objectors argue that the provision of the settlement agreement that prohibits Objectors from receiving attorneys' fees is invalid. Section IX.C states: "[T]he Parties hereto agree that a Class Member who objects to the settlement shall not be entitled to recovery of all or any portion of Attorneys' Fees, Costs and Expenses, and that the equitable common-fund doctrine does not apply to this settlement." (Doc. 98-1 at 28). The Court strikes that provision of the settlement agreement as against public policy, to ensure that objectors are not chilled from bringing forth reasonable objections. Objectors also contend that more information is needed before approval. While more extensive financial information concerning redemption rates, actual value of vouchers, etc., may be useful, it is not required, and the Court is satisfied with the comprehensive estimates that have been provided by Plaintiffs. Those estimates include voucher amounts for each of the classes, the rate of return for those class members who had to opt in, the rate of notice delivery for all classes, and estimates of the value of injunctive relief. There is no reason to further delay resolution. As to the "kill switch" provision, the parties have agreed that they will not disavow the settlement if it is determined to be a coupon settlement. In fact, they try to persuade the Court that even if this is a coupon settlement, its terms and attorneys' fees are fair under CAFA.

Objectors also take issue with the possible cy pres award contemplated by the parties. The settlement agreement provides that a cy pres payment:

[M]eans payment(s) to one or more charitable organizations determined by Costa consisting of either (i) the remaining amount of the Settlement Fund after satisfaction of any approved and valid Claims, and the payment of approved Attorneys' Fees, Costs and Expenses, Incentive Awards, and costs of class administration and notice; or (ii) One Million and no/100 Dollars ($1,000,000), whichever amount is less.

(Doc. 98-1 at 9–10). At the final approval hearing, counsel for Objector Miorelli said the cy pres award "is given if there's unredeemed coupons, which seems highly likely in this case." (Doc. 146 at 42:24–43:1). He emphasized that the cy pres recipient is undefined and that the amount could be given to the class through increased vouchers. Id. at 43:9–16, 44:5–9.

Cy pres awards are to be "as close as possible" to awards to the class, and they are often given to a defined organization when compensation to all class members is impossible or infeasible. See, e.g., Martinez v. FMS, Inc., No. 3:07-cv-1157-MMH-MCR, 2009 WL 10670235, at *2 (M.D. Fla. Apr. 24, 2009) ("Any unclaimed amounts of the Settlement Fund will be distributed as a cy pres award to Jacksonville Area Legal Aid, Inc."). The parties negotiated a cy pres award capped at $1 million. That amount is a small portion of the overall settlement. The Court does not void the cy pres portion of the settlement agreement but will require Court approval of any cy pres award.[14]

_____

[14] For coupon settlements, CAFA allows the Court to "require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties," but that amount may not be used to

Finally, Objectors underscore three potential signs of collusion: (1) when Class Counsel receives a "disproportionate distribution of the settlement" or "when the class receives no monetary distribution but class counsel are amply rewarded;" (2) a "clear sailing" provision that provides for payment of attorneys' fees apart from class funds, "which carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class;" and (3) when fees not awarded revert to defendants instead of to the class. <u>Bluetooth</u>, 654 F.3d at 947 (internal quotations and citations omitted). Attorneys' fees are analyzed more in depth <u>infra</u>, but crucially, fees not awarded to Class Counsel inure to the benefit of the class according to the settlement's terms. (Doc. 98-1 at 29). At the final fairness hearing, Class Counsel again emphasized that if the Court saw fit to cut attorneys' fees, that money would go to class members. Regardless of the "clear sailing" provision of the settlement agreement, the Court is reviewing the attorneys' fees request for reasonableness. Upon consideration and following the final fairness hearing, the Court is convinced that the settlement is non-collusive and was negotiated at arms-length. While objections are to be taken seriously, after close scrutiny, the objections here do not merit disapproval. The

---

calculate attorneys' fees under CAFA. 28 U.S.C. § 1712(e).

reaction of the class more broadly also shows that the settlement is fair, reasonable, and adequate.

v.   The settlement was achieved relatively late in the litigation process, which supports approval.

The Court considers "the degree of case development that class counsel have accomplished prior to settlement" to determine whether "counsel had an adequate appreciation of the merits of the case before negotiating." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 813 (3d Cir. 1995). Here, before reaching a settlement, the parties conducted numerous depositions, consulted with experts, engaged in discovery, drafted motions, mediated, and participated in a three-day evidentiary hearing on class certification. By the time the parties agreed upon a resolution in February 2020, Class Counsel "had access to sufficient information to adequately evaluate the merits of the case[s] and weigh the benefits of settlement against further litigation." Wilson v. EverBank, No. 14-CIV-22264, 2016 WL 457011, at *7 (S.D. Fla. Feb. 3, 2016) (quoting Lipuma, 406 F. Supp. 2d at 1324). Thus, the Court is satisfied that Class Counsel was able to negotiate and enter a settlement with significant knowledge of Plaintiffs' ultimate chance of success, which weighs in favor of settlement.

In sum, close analysis of each of the Bennett factors supports approval of the settlement under Rule 23.

### C. Attorneys' Fees and Costs

Attorneys' fees are a critical component of class action settlement agreements and require court approval. See Fed. R. Civ. P. 23(e)(2)(C)(iii); 23(h). Generally, courts use one of two methods to award reasonable attorneys' fees: the lodestar method or the percentage method. Under the lodestar method, "courts determine attorney's fees based on the product of the reasonable hours spent on the case and a reasonable hourly rate[,]" and "[t]he product is known as the lodestar." In re Home Depot Inc., 931 F.3d 1065, 1076 (11th Cir. 2019). At times, courts may apply a multiplier of the lodestar, increasing counsel's award. Id. Under the percentage method, "courts award counsel a percentage of the class benefit" or common fund. Id. In the Eleventh Circuit, the "benchmark range" or typical award is between twenty and thirty percent. See, e.g., id. When applying the percentage method, district courts consider the Johnson factors to determine whether the fees request is reasonable. Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). In Camden I Condominium Association, Inc. v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991), the Eleventh Circuit clarified that the percentage approach should be used in common fund cases, while the lodestar approach should be used for statutory fee-shifting awards.

CAFA provides the following directives for attorneys' fees awards in coupon settlements:

(a) CONTINGENT FEES IN COUPON SETTLEMENTS.—If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

(b) OTHER ATTORNEY'S FEE AWARDS IN COUPON SETTLEMENTS.—

(1) IN GENERAL.—If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

(2) COURT APPROVAL.—Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

28 U.S.C. § 1712(a), (b)(1), (b)(2). However, if a settlement includes both coupons to class members and equitable relief such as injunctive relief, then:

(c) ATTORNEY'S FEE AWARDS CALCULATED ON A MIXED BASIS IN COUPON SETTLEMENTS.— . . . .

(1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

(2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b).

28 U.S.C. § 1712(c)(1), (c)(2). Class Counsel recognizes these requirements with its request of "a ruling awarding attorneys' fees under Camden I's percentage-

of-the-benefit approach for non-coupon settlements, but alternatively ruling that, even if the settlement was a 'coupon' settlement under CAFA, the fees awarded would be reasonable and justified under 28 U.S.C. § 1712(b) and (c), the lodestar-with-multiplier approach." (Doc. 135 at 27).

In the wake of CAFA, courts analyzing potential "coupon" class action settlements have acknowledged that the statute is unclear. See, e.g., Linneman v. Vita-Mix Corp., 970 F.3d 621, 625 (6th Cir. 2020) (collecting cases and concluding "[a]s several of our sister circuits have noted, this statute is not a model of draftsmanship."); In re: Lumber Liquidators Chinese-Manufactured Flooring Prod. Mktg., Sales Pracs. & Prod. Liab. Litig., 952 F.3d 471, 488 (4th Cir. 2020) ("CAFA's coupon settlement provisions governing attorney's fees, codified at 28 U.S.C. § 1712(a)–(c), have been universally criticized as badly drafted.") (internal quotation marks omitted); Galloway v. Kansas City Landsmen, LLC, 833 F.3d 969, 973 (8th Cir. 2016) ("Nearly every federal court to consider § 1712 has agreed . . . [t]his is a badly drafted statute.") (internal quotation marks omitted). The statute does not define "coupon," so district courts must look to legislative history and subsequent case law to discern its meaning. See, e.g., Fruitstone, 2021 WL 2012362, at *5.

Congress passed CAFA in 2005 "primarily to curb perceived abuses of the class action device. One such perceived abuse is the coupon settlement, where defendants pay aggrieved class members in coupons or vouchers but pay class

counsel in cash." <u>Dardarian v. OfficeMax N. Am., Inc.</u>, No. 11-CV-00947-YGR, 2014 WL 7463317, at *2 (N.D. Cal. Dec. 30, 2014) (quoting <u>In re HP Inkjet Printer Litig.</u>, 716 F.3d 1173, 1177 (9th Cir. 2013) (internal citations omitted)). Congress was particularly concerned about "settlements under which class members receive nothing but essentially valueless coupons, while the class counsel receive substantial attorneys' fees." S. Rep. No. 109-14, at 30 (2005). Critically, "[t]he committee wish[ed] to make clear that it [did] not intend to forbid all non-cash settlements. Such settlements may be appropriate where they provide real benefits to consumer class members (e.g., where coupons entitle class members to receive something of actual value free of charge) or where the claims being resolved appear to be of marginal merit." <u>Id.</u> at 31.

While the Eleventh Circuit has not yet provided guidance on the meaning of coupon settlements, other federal courts of appeal and district courts within the Eleventh Circuit have discussed factors that may indicate a coupon settlement. In the Ninth Circuit, factors pointing to a coupon settlement include when the settlement gives class members little to no value, when class members must spend their own money to take advantage of vouchers, when vouchers may be used only for a few items or partial items, and when vouchers expire in a short period and are not freely transferrable. <u>See</u> <u>In re Online DVD-Rental Antitrust Litig.</u>, 779 F.3d 934, 951 (9th Cir. 2015) (finding that $12 Walmart gift cards were not coupons under CAFA and collecting cases to show that

"[d]istrict courts that have considered the issue have not classified gift cards as coupon settlements falling under CAFA."); see also Johnson v. Ashley Furniture Indus., Inc., No. 13-cv-2445 BTM(DHB), 2016 WL 866957, at *4 (S.D. Cal. Mar. 7, 2016) (finding that $25 Ashley Furniture vouchers were not coupons when "[c]lass members [did] not have to buy more expensive items to redeem their vouchers."); Chaikin v. Lululemon USA Inc., No. 3:12-cv-02481-GPC-MDD, 2014 WL 1245461, at *3 (S.D. Cal. 2014) (finding that $25 Lululemon vouchers were not coupons under CAFA when "[r]edemption of the credit vouchers [] require[d] no additional purchase" and vouchers were valid for six months); see also Reibstein v. Rite Aid Corp., 761 F. Supp. 2d 241, 255–56 (E.D. Pa. 2011) (finding that Rite Aid gift cards were not coupons under CAFA when they "ha[d] actual cash value, [were] to be mailed to a class of (mostly) regular customers, ha[d] no expiration date, [were] freely transferrable, and [could] be used for literally thousands of products for which ordinary consumers, including class members, have need."). Other courts have agreed that when class members need not spend their own money to use a reward, that weighs against the reward being a coupon settlement. See, e.g., Date v. Sony Elecs., Inc., No. 07-15474, 2013 WL 3945981, at *8 (E.D. Mich. July 31, 2013) ("Unlike a 'coupon,' the $60 gift card can be used to fund the entire purchase of small items or can be applied to the purchase of a more valuable item, at the consumer's option."); Chakejian v. Equifax Info. Servs. LLC, 275 F.R.D. 201, 215 n.17 (E.D. Pa. 2011)

("I do not find this case to present a coupon settlement, as class members do not have to purchase a product in order to obtain a benefit."); In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig., MDL No. 1967, 2011 WL 1790603, at *2–3 (W.D. Mo. May 10, 2011) (stating that Philips product vouchers were not coupons when they did not "necessarily require the class members' [sic] expend money of their own in order to realize the benefits of the settlement.").

District courts within the Eleventh Circuit have largely adopted the Ninth Circuit's rationale. See David v. Am. Suzuki Motor Corp., No. 08-CV-22278, 2010 WL 1628362 (S.D. Fla. Apr. 15, 2010) (not a coupon settlement when "[r]edemption of this award does not require any purchase on the part of class members"); Hillis v. Equifax Consumer Servs., Inc., No. 104-CV-3400-TCB, 2007 WL 1953464, at *11 (N.D. Ga. June 12, 2007) (not a coupon settlement when class members were "not required to spend any money in order to avail themselves of the in-kind relief" and when settlement had significant value to the class because injunctive relief directly addressed issues raised); see also Mahoney v. TT of Pine Ridge, Inc., No. 17-80029-CIV-MIDDLEBROOKS, 2017 WL 9472860, at *6 (S.D. Fla. Nov. 20, 2017). Diverging slightly from the Ninth Circuit's view, the Seventh Circuit has "rejected a narrow definition of 'coupon' by rejecting, for purposes of § 1712, a proposed distinction between 'vouchers' (good for an entire product) and 'coupons' (good for price discounts)."

36

In re Southwest Airlines Voucher Litig., 799 F.3d 701, 706 (7th Cir. 2015) (citing Redman v. RadioShack Corp., 768 F.3d 622, 636–37 (7th Cir. 2014)) (finding that replacement vouchers for free drinks on Southwest flights were coupons under CAFA).

To be sure, this settlement presents a close call, but the Court is persuaded by several factors. First, consumers need not spend any of their own money to take advantage of the vouchers. Vouchers are not "valueless." They enable class members to purchase a variety of entire Costa items, even if vouchers are not enough money for sunglasses or Costa's array of more expensive products.[15] Under different circumstances, that might be problematic, but here, the claims centered on allegedly illegal nominal fees and upcharges associated with buying and repairing Costa's sunglasses—not on any real issue with the sunglasses themselves. Thus, the value of the claims is substantially less than the price of sunglasses. On these facts, the vouchers are within the range of appropriate value to the class. Class members will not pay sales tax or shipping and handling, further showing that no expenditure is necessary to take advantage of the vouchers. Moreover, vouchers are freely stackable, transferrable, and do not expire for two years. The claims administrator reports that many consumers will receive multiple vouchers;

_____

[15] The vouchers, which are stackable, can also be used toward the purchase of more expensive items.

thus, the more a consumer was potentially wronged by Costa's upcharges and fees, the more value he or she secures from the settlement. While no expiration date might be preferable, two years is sufficient—and is perhaps short enough to incentivize class members to use vouchers promptly while being long enough that Costa does not get an end-run around paying out the settlement.

This settlement does not look like clear examples of coupon settlements. It is not In re Southwest Airlines Voucher Litigation, where class members had to purchase a flight to take advantage of free drink vouchers they were provided through the settlement. 799 F.3d at 706. It is not In re Easysaver Rewards Litigation, where class members were to receive a $20 voucher for a flowers, chocolates, and fruit basket company with monthly memberships, but where the vouchers were not enough for any one item, were limited to a handful of items, expired in one year, were not stackable, and could not be used during peak seasons. 906 F.3d 747, 753–57 (9th Cir. 2018). Nor is it In re Lumber Liquidators, where consumers with defective flooring from defendant needed a new floor to take advantage of the settlement credit for flooring supplies. 952 F.3d at 488. Of course, the vouchers here are not as flexible as those in In re Online DVD-Rental Antitrust Litigation, which were to be used at Walmart, or as those in some other non-coupon settlements.[16] 779 F.3d at 949. Still, given

---

[16] Plaintiffs argue that "the cases cited by Objectors simply reiterate that a coupon offers a discount on the purchase price while a voucher does not

the totality of the facts and circumstances, and after a thorough review of the law, this is not a coupon settlement.

Even so, the Court reviews this settlement with heightened scrutiny and with awareness of CAFA's requirements to ensure fairness to the class. See Fleury v. Richemont N. Am., Inc., No. C-05-4525 EMC, 2008 WL 3287154, at *3 (N.D. Cal. Aug. 6, 2008) ("[E]ven if the instant case did not involve any coupons such that CAFA would not apply, courts have still found the above CAFA provision instructive when the benefit to the class is coupon-like."). The attorneys' fees provisions of CAFA "are intended to put an end to the inequities that arise when class counsel receive attorneys' fees that are grossly disproportionate to the actual value of the coupon relief obtained for the class." In re HP Inkjet Printer Litig., 716 F.3d at 1179 (citing S. Rep. 109-14, at 29–32) (quotation marks omitted).[17]

---

require a class member to spend their own money." (Doc. 134 at 17) (citing and distinguishing cases to which Objectors cite). On balance, the Court agrees.

[17] Federal courts of appeal have provided different interpretations of the attorneys' fees provisions of CAFA. Compare In re HP Inkjet Printer Litig., 716 F.3d at 1181–83 (ruling that district courts must calculate attorneys' fees in coupon awards as a percentage of the redeemed value and must use the lodestar method to calculate fees for injunctive relief), with In re Southwest Airlines Voucher Litig., 799 F.3d at 710 (ruling that subsection (c) "allows a combination of percentage-of-coupons-used and lodestar, but it does not require that any portion of the fee be based on the percentage of coupons used.") (emphasis in original), and Galloway, 833 F.3d at 975 (agreeing with the Seventh Circuit's interpretation in Southwest and discussing how that interpretation leaves district courts with appropriate discretion).

The court's analysis in <u>Parsons v. Brighthouse Networks, LLC</u>, No. 2:09-CV-267-AKK, 2015 WL 13629647 (N.D. Ala. Feb. 5, 2015) is instructive. In <u>Parsons</u>, the court reasoned that "even if [the settlement] were a coupon settlement, Class Counsel would be entitled to seek a fee award based on the lodestar with multiplier method, pursuant to CAFA 28 U.S.C. § 1712(b)(1) and (2) and (c)(2)[,]" and that the same attorneys' fee awarded under the percentage method would be justified and awarded under CAFA. <u>Id.</u> at *15. Thus, the court concluded that "either a percentage-of-recovery analysis or a lodestar/multiplier analysis provides an independent basis supporting the requested fee as reasonable." <u>Id.</u> at *13.

As in <u>Parsons</u>, the Court here awards attorneys' fees according to a percentage of the recovery under <u>Camden I</u>, and also holds that even if CAFA applied, the Court may award fees based on a lodestar and a multiplier. Class Counsel requests $12 million in attorneys' fees and costs. (Doc. 98-1 at 28–29). The Court first determines whether that award is appropriate under a <u>Camden I</u> percentage-of-recovery analysis.[18]

---

[18] The parties claim that the settlement is worth $60 million and creates a $40 million common fund from which class members receive vouchers. (<u>See</u> Docs. 109, 109-1). The parties pre-determined an attorneys' fees award of $12 million and built that amount into the $40 million fund. (Doc. 109-1 at 22). Because shipping and handling costs $9.95 on Costa's website, Costa estimates that its agreement to pay shipping and handling confers an additional $20 million benefit to the class. <u>Id.</u> at 22–23. The Court finds that valuation to be overblown for purposes of determining an appropriate attorneys' fees award.

District courts must "articulate specific reasons for selecting the percentage upon which the attorneys' fee award is based." Camden I, 946 F.2d at 775. The Johnson factors to consider include: "(1) [t]he time and labor required;" "(2) [t]he novelty and difficulty of the questions;" "(3) [t]he skill requisite to perform the legal service properly;" "(4) [t]he preclusion of other employment by the attorney due to acceptance of the case;" "(5) [t]he customary fee;" "(6) [w]hether the fee is fixed or contingent;" "(7) [t]ime limitations imposed by the client or the circumstances;" "(8) [t]he amount involved and the results obtained;" "(9) [t]he experience, reputation, and ability of the attorneys;" "(10) [t]he 'undesirability' of the case;" "(11) [t]he nature and length of the professional relationship with the client;" and "(12) [a]wards in similar cases." Johnson, 488 F.2d at 717–19.

The Court has considered each of these factors and is especially struck by the time required of Class Counsel—well over 6,000 hours—and the complexity of managing three cases that involved novel legal issues. These claims involved a unique issue under FDUTPA, potential ambiguity in the MMWA, and extensive fact and expert discovery, including numerous depositions requiring intensive preparation. Class Counsel is experienced and reputable and took on

---

Instead, the Court values the settlement as a common fund considering the amount paid to the class in vouchers and the value of injunctive relief, then determines an appropriate fee award from that valuation.

significant contingency risk knowing that Costa could afford and would retain its own experienced, reputable counsel, which expended 15,000 hours in defending the cases. The settlement provides over fifty percent of a very large class with automatic relief, in addition to opt-in relief for other class members and a benefit to future Costa consumers and the public more broadly through injunctive relief. The Court also looks to decisions regarding attorneys' fees in similar common fund settlements. See, e.g., Waters v. Int'l Precious Metals Corp., 190 F.3d 1291, 1295–96 (11th Cir. 1999) (affirming $13.3 million in attorneys' fees and $2,400,204 in expenses from $40 million fund); Finerman v. Marriott Ownership Resorts, Inc., No. 3:14-cv-1154-TJC-MCR (M.D. Fla. Aug. 15, 2018) (Doc. 222) (attorneys' fees award of twenty-six and a half percent).

Considering the settlement a common fund, the Court must determine its value for the purposes of determining an attorneys' fees award. We know that $7.5 million in vouchers will be distributed to the Florida Purchase Class because that class had to opt in. The estimated minimum product voucher values are $8.99 for the Warranty Class, $22.99 for the Florida Repair Class, and $22.99 for the Nationwide Repair Class. (Doc. 135 at 10). The Warranty Class, Florida Repair Class, and Nationwide Repair Class comprise about fifty percent of class members and will receive their vouchers automatically. Costa is paying out $19.7 million in vouchers for those three classes. Thus, the total

42

face value of the vouchers to be distributed is $27.2 million.[19] The value of injunctive relief is also part of the common fund, for which the Court adds $5 million. See supra at 21–23; Saccoccio, 297 F.R.D. at 695 ("The attorneys' fees in a class action can be determined based upon the total fund, not just the actual payout to the class."). Thus, the value of the common fund is approximately $32 million.[20] Applying the Camden I midpoint benchmark of twenty-five percent to $32 million in value yields an $8 million fee.[21]

Turning to the lodestar method, as of February 2021, Class Counsel had incurred $2,615,374 in attorneys' fees and $641,154.87 in expenses, totaling $3,256,528.87.[22] (Doc. 109 at 13 n.7). An $8 million attorneys' fees award means

_____

[19] "In non-coupon settlements such as this one, the Eleventh Circuit has made clear that the value of the economic relief to the class is calculated based upon the amount made available to the class, not the total amount actually claimed by class members." Parsons, 2015 WL 13629647, at *14 (discussing Camden I, 946 F.2d 768).

[20] The Court does not accept the additional $20 million valuation for shipping and handling. Without additional evidence, the Court does not attempt to value the shipping and handling component.

[21] Alternatively, if the common fund itself includes attorneys' fees and is valued at $40 million, $8 million is twenty percent of $40 million, which is still within the benchmark range under Camden I.

[22] Class Counsel had devoted over 6,000 hours and had a lodestar of approximately $2,615,374 by February 9, 2021, upon filing the motion for attorneys' fees (Doc. 109). That averages to $433 per hour per timekeeper. At that same hourly rate, for purposes of argument, Costa would owe its own counsel $6,495,000 for 15,000 hours spent defending these cases.

Class Counsel also provided a Second Supplemental Declaration of Peter Hargitai (Doc. 131) with timesheets (Doc. 131-1) breaking down Class Counsel's

the Court would apply a multiplier of approximately 2.8, which is appropriate, plus expenses and costs included in the $8 million total.[23] This method would not only satisfy CAFA but also serves as a check on the Camden I percentage approach. See Waters, 190 F.3d at 1302 ("[W]hile we have decided in this circuit that a lodestar calculation is not proper in common fund cases, we may refer to that figure for comparison."); Parsons, 2015 WL 13629647, at *15 (collecting cases to conclude that "[i]n complex cases such as this one, courts routinely approve multipliers of three or more."); see also Beckman v. KeyBank, N.A., 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); Craft v. City of San Bernardino, 624 F. Supp. 2d 1113, 1125 (C.D. Cal. 2008) (allowing a multiplier of 5.2 when "there is ample authority for such awards resulting in multipliers in this range or higher").

---

hourly rates and time expended by individual timekeepers. By the time that supplemental information was filed on March 19, 2021, Class Counsel reports having spent 6,537.1 hours on the Haney, Reed, and Smith cases, amounting to $2,727,019.00 in fees, as well as $705,315.70 in costs. (Doc. 131-1 at 5). At this point, several months later, Class Counsel and Costa's Counsel have surely worked additional hours on the case. The Court relies most heavily on the lodestar reported in the February 2021 motion for attorneys' fees, as that is the motion to which Objectors were given opportunity to respond, but also considers those increases in deciding to apply a multiplier to the lodestar.

[23] In reality, the multiplier is probably lower because Class Counsel has expended more time and incurred additional costs and expenses since the February 2021 fees and costs estimations on which the multiplier of 2.8 is based.

One major issue remains: There is a $4 million difference between the attorneys' fees request of $12 million and the Court's decision to award $8 million. Under the settlement agreement, if that $4 million goes to attorneys' fees, Costa actually pays the $4 million in full to Class Counsel. Having now reduced attorneys' fees by $4 million, those funds do not revert to Costa; instead, under the settlement agreement, they inure to the benefit of the class assumedly through increased voucher amounts. But that means Costa will only pay a portion of the $4 million because not all class members will redeem their vouchers. The Court intends to reduce attorneys' fees for Class Counsel but increase the value of the settlement to the class by $4 million. The Court defers ruling on how the $4 million will be handled and asks that Class Counsel confer with Costa's counsel and file additional briefing on this discrete issue.

### D. Service Awards

Class Counsel originally sought service awards of $10,000 for each of the three named Plaintiffs. (Doc. 91 at 15). After that request, the Eleventh Circuit decided <u>Johnson</u> and prohibited service awards for class action representatives. 974 F.3d 1244. Class Counsel has revised its request and asks for service awards only if <u>Johnson</u> is vacated. (Doc. 135 n.10). <u>Johnson</u> has not been vacated at this time, so the Court cannot approve service awards.

The Eleventh Circuit, however, has yet to issue a mandate in <u>Johnson</u>, and a petition for <u>en banc</u> rehearing remains pending. Thus, the Court will

retain jurisdiction to allow Class Counsel to renew the request for a service award in the event that <u>Johnson</u> is reversed. <u>See</u> <u>Metzler v. Medical Mgmt. Int'l, Inc.</u>, No. 8:19-cv-2289-VMC-CPT, 2020 WL 5994537, at *3 (M.D. Fla. Oct. 9, 2020) (retaining jurisdiction for the "limited purpose of revisiting the denial of service awards" if <u>Johnson</u> is reversed).

### III.   CONCLUSION

Accordingly, it is hereby

**ORDERED:**

1.     Class Counsel's Unopposed Motion for Attorneys' Fees and Expenses and Conditional Request for Incentive Awards to Class Representatives (Doc. 109) is **GRANTED in part**, **DEFERRED in part**, and **DENIED in part**, as stated herein. The parties shall file additional briefing as instructed no later than **October 20, 2021**. If they so choose, Objectors may respond to the additional briefing no later than **November 10, 2021**.

2.     Plaintiffs' Motion for Final Approval of Class Action Settlement (Doc. 135) is **GRANTED in part**, **DEFERRED in part**, and **DENIED in part**, as stated herein.

3.     Objector Mitchell George Miorelli's Motion to Strike or Exclude Declaration of Thomas Scott (Doc. 118) is **DENIED**.

4.     The objections of John W. Davis, Austin Valls, and Mitchell George Miorelli (Docs. 112, 113, 114, 115, 125, 117) have been considered as stated herein.

5.     This is not the Court's final order; the final order will be entered after the Court receives the additional briefing.

**DONE AND ORDERED** in Jacksonville, Florida the 21st day of September, 2021.



TIMOTHY J. CORRIGAN
United States District Judge

tnm
Copies:

Counsel of record